WILLIAM S. DALEY, Appellant, v THE RELATED COMPANIES, INC., et al., Respondents. (Appeal No. 1.)

WILLIAM S. DALEY, Respondent, v THE RELATED COMPANIES, INC., et al., Appellants, et al., Defendants. (Appeal No. 2.)

First Department, March 19, 1992

*Paul T. Shoemaker* of counsel *(Jeffrey L. Liddle* and *Barbara R. Shweky* with him on the brief; *Liddle, O'Connor, Finkelstein & Robinson,* attorneys), for William S. Daley, appellant in Appeal No. 1 and respondent in Appeal No. 2.

*Mark Walfish* of counsel *(Liane R. White* with him on the brief; *Esanu Katsky Korins & Siger,* attorneys), for The Re-

lated Companies, Inc. and others, respondents in Appeal No. 1 and appellants in Appeal No. 2.

## OPINION OF THE COURT

Asch, J.

Plaintiff Daley was employed as vice-president of the defendant The Related Companies, Inc. and as president of defendant Related Equities Corporation. Pursuant to an employment agreement entered into by the parties, plaintiff was to receive compensation of commissions based on real estate syndications which took place during his employment. The agreement further provided that plaintiff "shall have a draw against [his] commission at the rate of $80,000 per year, paid bi-weekly at the same time and on the same basis as all other Related executive personnel."

The parties had a dispute as to the commissions owed to plaintiff and this action was commenced. In the first order appealed from, the IAS court granted defendants' motion to dismiss the second and fourth causes of action based on the New York Labor Law, finding that the plaintiff was a member of the "narrow class of commission salesmen excluded from the wage claim protections" of the Labor Law. In the second order appealed from, the IAS court, *inter alia,* granted plaintiff's motion for an order pursuant to Debtor and Creditor Law § 279 restraining defendants Ross and Wine from disposing of any assets transferred to them by defendant The Related Companies, Inc., except in the ordinary course of business, and restraining the corporate defendant from disposing of any general partnership interests except in the ordinary course of business.

The IAS court erred in finding that the definition of "commission salesman" in Labor Law § 190 (6), which excludes employees "whose principal activity is of a supervisory, managerial, executive or administrative nature", applies to exclude plaintiff from the ambit of section 198 (1-a), which was the basis of plaintiff's claims for attorneys' fees and an additional 25% of wages due as liquidated damages in his second and fourth causes of action. This is apparent when the statute is read as a whole. Thus "employee" is also defined in section 190 (2) as "any person employed for hire by an employer in any employment". Wages is defined in section 190 (1) as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a

time, piece, *commission* or other basis". (Emphasis added.) In section 191, dealing with frequency of payments, different subsets of workers are treated in different manners and "commission salesman" is used as one of these categories. Obviously, if plaintiff raised an objection to the frequency of his commission payments, this section would be relevant as would the fact as to whether or not he acted primarily as a supervisor or manager. However, plaintiff makes his claim pursuant to section 198 (1-a) which reads in pertinent part: "In any action instituted upon a wage claim by *an employee* \* \* \* in which the *employee* prevails, the court shall allow such *employee* reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage \* \* \* was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due." (Emphasis added.) Thus, this applies equally to all employees as defined in section 190 (2), and whether or not plaintiff comes under the definition of "commission salesman" in section 190 (6) is simply irrelevant. This analysis of the statute is further buttressed by section 192 (3) which deals with the cash payment of wages and which specifically excludes "any person employed in a bona fide executive, administrative, or professional capacity whose earnings are in excess of three hundred dollars a week". If the same type of exclusion was intended by the Legislature in section 198 (1-a), for commission salesmen/ executives or executives as a class, it would have simply used similar language.

Accordingly, executives are within the class of employees protected by section 198 (1-a), from a plain reading of the statute. Moreover, recent case law compels the same conclusion. Thus in *Klepner v Codata Corp.* (139 Misc 2d 382, *affd* 150 AD2d 994), where the defendant contended that the plaintiff was not an employee within the meaning of section 198 since he was an executive, the court disagreed, finding that an attorney employed as a " 'general counsel' " and " 'assistant to the president' " of a corporation met the terms of the definition set forth in section 190 and was, therefore, covered. It noted that the definition of employee in Labor Law § 2 (5) (i.e., " 'Employee' means a mechanic, workingman or laborer working for another for hire") was not applicable to article 6, where section 190 mandates that its definitions are to be used in that article. We affirmed the Supreme Court in *Klepner* without opinion. In *Matter of Dean Witter Reynolds v Ross* (75 AD2d 373), we also found there was a rational basis

for an administrative determination that an account executive at a brokerage firm was an "employee" within the meaning of article 6. *(See also Magness v Human Resource Servs.,* 161 AD2d 418; *Gerlach v Horn & Hardart Co.,* 683 F Supp 342, 346; *Maggione v Bero Constr. Corp.,* 106 Misc 2d 384.)

The defendants further urge that the plaintiff's claim under the second and fourth causes of action is for incentive compensation which is not a claim for wages under the Labor Law. However, *Magness v Human Resource Servs. (supra)* and *Matter of Dean Witter Reynolds v Ross (supra),* cited by defendants in support of this proposition, are simply inapplicable to the facts before us. In *Magness,* the employment contract provided for a "salary" for plaintiff plus "supplemental income" on revenues received by defendant. While we found the plaintiff, as an executive, was within the ambit of section 198, we found the " 'supplemental income' " was clearly incentive compensation and not " 'wages' " pursuant to Labor Law § 190 (1). *(Magness v Human Resource Servs., supra,* at 419.) Likewise in *Dean Witter Reynolds,* the account executive was guaranteed a monthly salary and was entitled to receive additional " 'incentive compensation' ", and we found that the term " 'wages' " does not encompass an incentive compensation plan. *(Matter of Dean Witter Reynolds v Ross, supra,* at 381.) Here, however, plaintiff seeks to recover commissions which were not any form of incentive compensation. The agreement he entered did not guarantee him a base salary, with additional compensation due as incentive. His remuneration throughout the agreement is referred to as "commissions". He received a "draw" against these commissions which was to be paid biweekly. The commissions were payable, however, "balancing against your draw".

Finally, with respect to this order, defendants seek, as alternative relief, if we fail to uphold the dismissal of the second and fourth causes of action, a dismissal of plaintiff's demand for punitive damages. However, since defendants did not cross-appeal from this order, we are without power to grant them affirmative relief *(see, Hecht v City of New York,* 60 NY2d 57).

After the IAS court dismissed the second and fourth causes of action, which we have discussed, the plaintiff amended the complaint to assert a fifth cause of action. In this, he alleged that subsequent to the commencement of his action, partnership assets valued in excess of $1 million were transferred from defendant The Related Companies, Inc. to

defendants Ross and Wine without consideration and without notice to plaintiff. Thereafter, he moved, pursuant to Debtor and Creditor Law § 279 to: (1) restrain Ross and Wine from disposing of the assets conveyed to them by the corporate defendant; (2) set aside as fraudulent conveyances these transfers; (3) direct the three defendants to pay attorneys' fees pursuant to Debtor and Creditor Law § 276-a; and (4) grant an order of attachment against the property of the corporate defendant. The IAS court granted injunctive relief restraining Ross and Wine from disposing of any assets transferred to them except in the ordinary course of business, and the corporate defendant from disposing of any general partnership interests except in the ordinary course of business. We find that this constituted an abuse of its discretion and therefore reverse this second order.

While the IAS court, in fashioning relief for a creditor under section 279 of the Debtor and Creditor Law, may restrain defendants from transferring property, the interim or temporary use of such restraint, before final adjudication, should follow the rules for the issuance of preliminary injunctions (CPLR 6301 *et seq.*). While the nisi prius court discussed and applied the requisite elements for a preliminary injunction, it erred in its analysis and the conclusion it reached.

Initially, plaintiff failed to establish the necessary element of irreparable harm absent the grant of such relief. Plaintiff seeks only money damages, pursuant to his breach of contract claims and has no specific claim to the general partnership assets of the corporate defendant. "An injunction may no longer be issued on the ground that the defendant merely threatens to dispose of his property not the subject matter of the action, to render himself judgment proof. (CPA § 878 (2)). Because an injunction should never issue where there are other adequate remedies and CPLR 6201 (3) authorizes an order of attachment in this situation, no hardship will be worked by its omission from the injunction statutes. A preliminary injunction is still unavailable in an action for a sum of money only." (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C6301:1, at 209; *see also, Rosenthal v Rochester Button Co.,* 148 AD2d 375.) We note that the IAS court specifically held that plaintiff did not come forward with sufficient evidence of fraudulent intent on the part of defendants to warrant issuance of an attachment and denied plaintiff's motion for such relief pursuant to CPLR 6201. Finally, plaintiff failed to demonstrate, in any event, on

the record herein, that the corporate defendant was in financial distress so as to prevent any meaningful recovery. It appears that the net worth of the corporate defendant and its affiliates exceeds plaintiff's claims by multiples.

Accordingly, the order of the Supreme Court, New York County (Beatrice Shainswit, J.), entered January 24, 1991, granting defendants' motion to dismiss the second and fourth causes of action of the complaint should be reversed, on the law, and the motion denied, with costs and disbursements payable to plaintiff.

Order of the Supreme Court, New York County (Beatrice Shainswit, J.), entered June 17, 1991, which, *inter alia,* granted plaintiff a preliminary injunction, pursuant to Debtor and Creditor Law § 279, restraining defendants from disposing of any partnership assets except in the ordinary course of business, should be reversed, to the extent appealed from, on the law and facts, and in the exercise of discretion, and the motion denied, with costs and disbursements payable to defendants-appellants.

KUPFERMAN, J. (dissenting in part). The only issue that divides us is the right of the plaintiff to claim attorneys' fees and an additional 25% of wages due in liquidated damages on his second and fourth causes of action. (Labor Law § 198 [1-a].)

This depends on whether there was a "willful" failure to pay "the wage" required.

The IAS court based its decision, as delineated in our majority opinion, on an exclusion for "commission salesman". (Labor Law § 190 [6].)

However, my conclusion is based on the special arrangement of the employment agreement, which I set out in full.

"Your compensation will be based upon the gross proceeds of Syndications during each employment year based on the annual anniversary of your employment which is expected to commence May 16, 1983 (but not including the Syndication of the following transactions: Talcott, Related Rural IV, RKC Tribune and Granada), on the following basis: 5/16 of 1% of the first $50 million of Syndication proceeds; 3/16 of 1% of the next $50 million of Syndication proceeds; and 1/4 of 1% of any excess over $100 million of syndication proceeds. Your commissions will be based upon the gross amount of capital contributions paid or agreed to be paid by investors, without any reduction for expenses of Syndication, underwriters commissions, expenses of the marketing company, or any other

expenses, but reduced in certain instances by 'present value' calculations, as set forth below. For those Syndications where deferred payments of investor capital contributions bear interest, gross syndication proceeds shall not include any amounts paid as interest.

"For purposes of reflecting the results of Syndications on our combined financial statements, we reduce deferred payments of investor capital contributions which do not bear interest by discounting the same to 'present value' with an interest rate of one percentage point in excess of the prime rate of Chemical Bank, New York, New York. If Syndication proceeds in any employment year do not exceed $100 million (i.e., your compensation based on the formula in the preceding paragraph is not more than $250,000) then your commissions will be based upon the undiscounted amount of Syndication proceeds. However, if Syndication proceeds in any employment year exceed $100 million (i.e., except for the adjustment set forth below, your compensation would be greater than $250,000), then an appropriate adjustment shall be made so as to base your compensation upon the present value of the noninterest bearing portion of Syndication proceeds but not in an amount which would reduce your compensation below $250,000 employment per year.

"For example, if Syndication proceeds, without present value calculations, were $150 million, but the present value thereof were $120 million, then your compensation for the employment year would be $300,000, irrespective of whether those Syndications which were discounted were among the first $100 million during the employment year or among the last $50 million.

"You shall have a draw against your commission at the rate of $80,000 per year, paid bi-weekly at the same time and on the same basis as all other Related executive personnel. As an additional draw against your commission, we shall make payments on your present automobile lease.

"The above commissions will be payable, balancing against your draw, within 30 days after the end of each employment year quarter, with respect to Syndications which have closed during the quarter then ended. However, there shall be no payments made at the end of the first or second quarters of your first employment year; instead, within 30 days after the end of the third quarter payment will be made with respect to the first two quarters, and within 30 days after the end of

your first employment year payment will be made with respect to the last two quarters of such year. If your employment with us is terminated prior to the end of nine months, you shall not be entitled to receive any of the commissions set forth above, but shall receive only your draw. However, after the first nine-month period you shall be deemed to have earned your commissions irrespective of when they are to be paid. Either you or we may terminate your employment with us at any time for any reason or for no reason and neither of us shall have any liability to the other on account of such termination, except that we shall owe you commissions earned to the extent set forth above.

"The payment of your commissions will be subject to the additional condition that with respect to the amounts earned by you in any employment year we need pay you on a cumulative basis in respect of such year, and no later than 30 days after the end of the year, only $150,000. We may delay payment of any additional earnings up to $250,000 for up to one additional year, additional earnings between $251,000 and $350,000 for up to two additional years, and above 350,000 of earnings for up to 3 additional years, to the extent that we in our sole discretion determine is consistent with our cash flow reequirements [sic], except that any amounts which are paid more than 120 days after the end of the employment year in which earned shall be increased by the same 'present value' factor as was applied to Syndication proceeds on which your commissions were based.

"All amounts drawn by you during the employment year shall be applied against amounts owed to you in the order of their maturity.

"You will be given tax shelter in an amount equal to 80% of the first $250,000 of compensation and 100% of any excess actually received by you in any employment year. If we are unable to give you that amount of tax shelter, we shall instead increase your compensation on a dollar-for-dollar basis. In the event of the termination of your employment with us we shall not terminate or reduce your interest in any entity from which you were allocated taxable losses so as to cause a recapture of such losses previously allocated to you.

"In those Syndications where we or any affiliate receive an interest in sale or refinancing proceeds (the 'back-end'), you shall receive a 10% interest in so much of the back-end as is allocated to the Syndication department. You shall vest in

your interest in such back end items over a four year period, on a cumulative basis, 30% at the end of the first year, and as to each succeeding year, 30%, 20% and 20%, respectively. If your employment hereunder is terminated prior to the end of the first year, then you shall not vest at all as to back-end items, but if your employment is terminated after the first year, then in addition to any amount as to which you had vested at the end of the preceding year, you shall vest pro rata with respect to the current year, based upon the number of days in the current year before your employment terminated. After you have been employed by us for four years, you will vest immediately in your share of the back-end of each Syndication as of the Syndication closing date."

This was no ordinary wage arrangement. While the Labor Law provision might apply to the $80,000 draw, inasmuch as the plaintiff was employed for seven years and received $1,674,000 he has clearly received that basic amount.

The agreement cries out for interpretation. Under the circumstances, there cannot be a "willful" failure to pay "the wage" required.

I would affirm the dismissal of the second and fourth causes of action. *(Cf., Magness v Human Resource Servs.,* 161 AD2d 418.)

SULLIVAN, J. P., MILONAS and WALLACH, JJ., concur with ASCH, J.; KUPFERMAN, J., dissents in part in an opinion, with respect to Appeal No. 1.

Order of the Supreme Court, New York County, entered January 24, 1991, granting defendants' motion to dismiss the second and fourth causes of action of the complaint is reversed, on the law, and the motion denied, with costs and disbursements payable to plaintiff.

Order of the Supreme Court, New York County, entered June 17, 1991, which, *inter alia,* granted plaintiff a preliminary injunction, is reversed, to the extent appealed from, on the law and facts, and in the exercise of discretion, and the motion denied, with costs and disbursements payable to defendants-appellants. *[See,* — AD2d —, June 23, 1992.]