**Youlia MITEVA, Plaintiff,**

v.

**THIRD POINT MANAGEMENT COMPANY, L.L.C. and Daniel S. Loeb, Defendants.**

**No. 03 Civ. 1671(VM).**

United States District Court, S.D. New York.

July 1, 2004.

See, also, 219 F.R.D. 64.

---

Andrew G. Celli, Jr., Emery, Celli, Brinckerhoff & Abady, LLP, New York, NY, for Plaintiff and Counter–Defendant.

Brian Dunefsky, Marc S. Dreier, Dreier, LLP, New York, NY, for Defendants, Counter–Claimant and Counter–Defendant.

Michael B. Roth, Dreier LLP, New York, NY, for Defendants and Counter–Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Youlia Miteva ("Miteva"), a former analyst for Third Point Management, L.L.C. ("Third Point"), brought this action against Third Point and Daniel Loeb ("Loeb"), the sole owner, chief operating officer, and Managing Member of Third Point (and together with Third Point collectively "Defendants"). Miteva asserts claims under the New York Labor Law as well as breach of contract and other common law causes of action, one of which Miteva voluntarily dismissed. Defendants move for partial summary judgment on all but the breach of contract claim. The Court rejects Defendants' theory that the New York Labor Law does not apply to Miteva's claim, and finds that there is sufficient evidence in the record to maintain the remaining common law claims. Accordingly, Defendants' motion is denied.

### I. FACTS AND PRIOR PROCEEDINGS

In the spring of 2000, Loeb hired Miteva to work at Third Point as an analyst with a starting salary of $75,000 plus a discretionary bonus.

In July 2000, just a few months after hiring Miteva, a Bulgarian citizen residing in New York, Loeb increased her salary from $75,000 to $100,000, and promised her a year-end bonus of approximately

$240,000, of which she received $160,000 up front, with the remaining $80,000 to be paid on a deferred basis in December 2002. He also promised to sponsor her application for status as a permanent resident alien in the United States. In January 2001, Loeb told Miteva he would raise her 2001 year-end bonus by 60 percent over her 2000 bonus. In February of 2002, however, Loeb gave Miteva only an $80,000 bonus for 2001, a decline of 66 percent from her 2000 bonus. As a result, Miteva told Loeb that she was resigning immediately. Loeb induced Miteva to stay by offering her a flat bonus of $300,000 for her performance in 2001, again to be paid on a partly deferred basis: $80,000 immediately, $70,000 in June 2002, and $140,00 in December 2003, with $10,000 to be invested through Third Point in Miteva's name. Despite alleged reservations regarding the delayed payment schedule, Miteva agreed not to resign.

In March 2002, Miteva again contemplated resigning from Third Point, but decided to wait until after she received her 2001 delayed bonus of $70,000, which was due in June 2002. After she collected the bonus, Miteva told Loeb that she was resigning due to concerns over the way he ran the company. Again Loeb promised to increase her compensation if she would stay. Miteva agreed to stay at Third Point, conditioned upon a contract that specified that she would receive a bonus of $650,000 for her performance during 2002, and that her compensation for 2003 would be tied directly to the performance of a $10 million fund that Miteva would manage.

Unbeknownst to Miteva, Loeb regularly expressed dislike for Third Point's analysts, and specifically for Miteva, in ongoing email exchanges with Robert Chapman ("Chapman"), a friend and fellow hedge fund manager. In one exchange, referring to the Third Point analysts, Loeb told Chapman, "[I] hate them intensely." (Email from Loeb to Chapman dated Aug. 5, 2002, attached as Ex. 5 to Declaration of Eric Hecker dated Apr. 2, 2004 ("Hecker Dec.").) In August 2002, Loeb sent an email to Chapman on the subject of firing employees, and stated, "I need to conduct a pogrom around here." (Email from Loeb to Chapman dated August 15, 2002, attached as Ex. 6 to Hecker Dec.) In November 2002, Loeb, apparently sarcastically, wrote to Chapman that Miteva deserved a million dollars, and outlined a script in which he would offer her the money, never give it to her, "and then deny that i [Loeb] said it just to make her nuts." (Email from Loeb to Chapman dated Nov. 18, 2001, attached as Ex. 4 to Hecker Dec.)

Third Point's profitability declined drastically in late 2002, and Loeb fired Miteva on December 27, four days before her 2002 performance bonus of $650,000 was due. Shortly before firing Miteva, Loeb sent Chapman an email referencing a violent scene from the movie "The Godfather" and stated that he was "settling his score" by terminating Miteva's employment. (Email from Loeb to Chapman dated Dec. 27, 2002, attached as Ex. 8 to Hecker Dec.) A few minutes before firing Miteva, Loeb wrote to Chapman that the "nuclear submarine launch sequence" had been "initiated," and was "headed for [E]astern [E]urope," a seeming reference to Miteva's Bulgarian nationality. (Email from Loeb to Chapman dated Dec. 27, 2002, attached as Ex. 9 to Hecker Dec.) Chapman then responded, "has target located ICBM on radar yet?," which appears to be an inquiry as to whether Miteva knew she was going to be fired. (Email from Chapman to Loeb dated Dec. 27, 2002, attached as Ex. 9 to Hecker Dec.) In response, Loeb wrote that "the eagle has landed," and that the firing was "very uneventful." (Email from

Loeb to Chapman dated Dec. 27, 2002, attached as Ex. 9 to Hecker Dec.)

The next day, Loeb wrote another email to Chapman expressing his anger towards Miteva, stating, "I woke up at least 10 times tossing and turning about this. Miteva was so happy i [fired] her." (Email from Loeb to Chapman dated Dec. 28, 2003, attached as Ex. 10 to Hecker Dec.) Loeb told Chapman that he had heard Miteva planned to take a three-month vacation, and then wrote, "[im]agine that, she loses me millions and now i pay for her travels for 3 [months]!" *Id.*

On April 25, 2003 in an email to Alan Fournier ("Fournier"), a friend and hedge fund manager, Loeb, using a particularly vulgar epithet in referring to Miteva as a woman, told Fournier, "she said you were 'dumb as a truck driver' .... I guess it's better to be a dumb employed truck driver than a brilliant unemployed former analyst." (Email from Loeb to Fournier dated Apr. 25, 2003, attached as Ex. 17 to Hecker Dec.) Miteva denies that she ever made the remark about Fournier that Loeb ascribes to her.

Loeb apparently became angry when he suspected that, had she not been fired, Miteva had planned to leave Third Point voluntarily after receiving her 2002 year-end bonus. He contacted Bloomberg L.P. ("Bloomberg"), which handles Third Point's email archives, to request a transcript of every email Miteva sent after December 31, 2001. In doing so, Loeb stated that "[t]his request is regarding a current employee and is being made solely for a legitimate securities or regulatory compliance purpose." (Letter from Loeb to Bloomberg dated Dec. 30, 2002, attached as Ex. 11 to Hecker Dec.) Miteva was no longer a "current employee" of Third Point because Loeb had fired her three days earlier. Loeb used the information that he received from Bloomberg in a letter he wrote to another hedge fund

manager, Jon Brooks ("Brooks"), in which he accused Brooks of conspiring with Miteva and another former Third Point employee to help them find alternate employment. In that letter, Loeb included emails he had obtained from Bloomberg sent by Miteva disparaging Brooks to a third party. Loeb wrote to Brooks, "I hope that you had not acted out of malice at the time you clandestinely assisted my employees abandon ship." (Letter from Loeb to Brooks dated Jan. 2, 2003, attached as Ex. 13 to Hecker Dec.)

After Third Point fired her, Miteva interviewed with SAC Capital Management ("SAC"), another investment management firm, and SAC offered her a position as an analyst on March 5, 2003. Will Patty ("Patty") from SAC, who was conducting due diligence on Miteva, then contacted Loeb to ask for a reference. Patty asked Loeb several questions about Miteva, but Loeb would only confirm the dates of her employment. Loeb refused to answer any further questions from Patty about Miteva, but offered to answer questions about any other Third Point employees.

After speaking with Patty, Loeb called Thomas Conheeney ("Conheeney"), the chief operating officer of SAC, explained that he had been contacted by Patty, and offered to talk to Conheeney about Miteva. Conheeney did not know who Miteva was. Conheeney spoke with Patty and then returned Loeb's phone call. According to Conheeney, Loeb told him that although Miteva was bright, her ideas consistently lost money for Third Point, and that she wanted to be more of a portfolio manager than an analyst. Conheeney stated in his deposition that SAC rescinded Miteva's job offer because of Conheeney's conversation with Loeb. This action followed.

Miteva asserted claims against Defendants for breach of contract, breach of the covenant of good faith and fair dealing,

violation of the New York Labor Law, and tortious interference with prospective business relations. Defendants now move for summary judgment on the breach of implied covenant of good faith and fair dealing claim, the New York Labor Law claims, and the tortious interference with prospective business relations claim. They also seek to preclude Miteva from demanding punitive damages in connection with her tortious interference claim, should that claim survive summary judgment. Miteva has consented to the dismissal of her implied covenant of good faith and fair dealing claim. The breach of contract claim is not a subject of the present motion.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c); *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004). When ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

To defeat a motion for summary judgment, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. "Conclusory allegations, conjecture, and speculation" will not establish a genuine issue of fact for trial. *Kerzer,* 156 F.3d at 400.

### B. *NEW YORK LABOR LAW CLAIMS*

 Article 6 ("Article 6") of the New York Labor Law (the "Labor Law") regulates the payment of wages by employers to employees. Miteva makes substantive claims under Labor Law Article 6, § 191(3) and § 193, and a claim for damages and attorney's fees under § 198. Specifically, Miteva alleges that Defendants failed to pay her in a timely manner, that Defendants made illegal deductions from her salary, and that, as a result, she is entitled to liquidated damages equal to twenty-five percent of any wages owed to her, plus attorney's fees. Defendants argue that the definitions in § 190 of Article 6 exclude individuals employed in an "executive, managerial or administrative capacity" from recovery under Article 6. (Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment, dated March 12, 2004, ("Def.Memo.") at 11.) Defendants further argue that they are entitled to summary judgment on Miteva's Labor Law claims because at the time relevant to this claim, Miteva was an "executive or professional" as defined under § 190 and therefore is barred from recovery under Article 6. (*Id.* at 12.)

There is significant disagreement among courts in New York about whether executives, managers, administrators, supervisors, and professionals are "employees" for the purpose of Article 6. Arguably, the New York Court of Appeals tangentially addressed the question in *Gottlieb v. Kenneth D. Laub & Co., Inc.,* 82 N.Y.2d 457,

605 N.Y.S.2d 213, 626 N.E.2d 29 (1993). Nonetheless, lower courts, both federal and state, since then have debated and diverged over *Gottlieb's* applicability to the issue.

### 1. *Article 6 of the Labor Law*

Section 190 of the Labor Law sets forth definitions that apply specifically and exclusively to Article 6. Sub-section 190(2) defines "employee" as "any person employed for hire by an employer in any employment," and § 190(3) defines "employer" to "include[ ] any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business, or service. The term 'employer' shall not include a governmental agency." Section 190 then defines four specific sub-categories of employees: "manual worker," "railroad worker," "commission salesman," and "clerical or other worker" to which the various provisions of Article 6 apply. *Id.* §§ 190(4)—(7).

"Commission salesman" is defined as "any employee whose principal activity is the selling of any goods, wares, merchandise, services, real estate, securities, insurance or any article or thing and whose earnings are based in whole or in part on commissions. The term 'commission salesman' does not include an employee whose principal activity is of a supervisory, managerial, executive or administrative nature.". *Id.* § 190(6). Following the definitions of manual worker, railroad worker and commission salesman in §§ 190(4)—(6), § 190(7) of the statute defines "clerical or other worker" as "all employees not included in [§§ 190(4)—(6)], except any person employed in a bona fide executive, administrative or professional capacity whose earnings are in excess of six hundred dollars a week." The definitions of "manual worker" in § 190(4) and "railroad worker" in § 190(5) make no reference to executives, professionals, administrators, supervisors, or managers.

The text of Article 6 supports a broad reading of the term "employee." Sub-section 190(6) states that "[t]he term 'commission salesman' does not include *an employee* whose principal activity is of a supervisory, managerial, executive or administrative nature." (emphasis added). The use of the defined term "employee" in § 190(6) and the express exclusion from the category of "commission salesman" of employees who act in a "supervisory, managerial, executive or administrative" capacity suggests that individuals who act in those capacities are "employees" unless otherwise excluded. The language of § 190(6) also indicates that to arrive at the more narrow definition of "commission salesmen," these particular "employees" must be specifically excluded. Thus, while it is clear from the language of § 190(6) that individuals serving in supervisory, managerial, executive, or administrative capacities do not fall into the sub-category of "commission salesmen," the same language implies that those individuals *do* fall within the broader Article 6 definition of "employee."

The language of § 190(7) supports a similar conclusion that the term "employee" should be read broadly to include executives, administrators, and professionals. Sub-section 190(7) defines "[c]lerical or other worker" as "includ[ing] *all employees* not included in subdivisions four, five, and six of this section, *except* any person employed in a bona fide executive, administrative, or professional capacity whose earnings are in excess of six hundred dollars a week." *Id.* § 190(7) (emphasis added). This language indicates that the category of "clerical or other worker" is intended to include all "employees" *except* those employed as executives, administrators, or professionals.

Like § 190(6), the language of § 190(7) implies that individuals "employed in a bona fide executive, administrative, or professional capacity" are "employees" for purposes of Article 6, but nonetheless are excluded from the narrower definition of "clerical or other worker," presumably for the specific limited purposes that the statute in other provisions seeks to distinguish among the subcategories of employees.

Sub-section 192(1) of Article 6, for example, addresses cash payment of wages for "*any* employee," and § 192(2) specifically states that "*[t]his section* shall not apply to any person employed in a bona fide executive, administrative, or professional capacity whose earnings are in excess of six hundred dollars a week...." *Id.* § 192(2) (emphasis added). This language clearly suggests that persons "employed in a bona fide executive, administrative or professional capacity" are in fact defined as "employees" throughout Article 6 but are expressly excluded from the cash payment requirement § 192 imposes on employers because they would otherwise be included in that obligation by the general definition of "employee" in § 190(2). Thus, although for purposes of § 192 "employees" who are "employed in a bona fide executive, administrative or professional capacity" are excluded from the cash payment benefit there provided, nothing in the language of § 192 suggests that these executive or professional "employees" should be excluded entirely from all other employment rights Article 6 confers on all except the specifically excluded sub-categories of employees. Furthermore, if all types of executives and professionals were already carved out of the definition of "employee" in § 190(2), the particular exclusion of them found in § 192(2) would be redundant and unnecessary. Conversely, the specific exception of that class of employees from § 192(2) for purposes of that section supports the conclusion that they

fall into the category of "employee" for purposes of Article 6.

Section 198–c of Article 6, which addresses the payment of benefits and wage supplements, is analogous to § 192, in that § 198–c(3) specifically states that "*[t]his section* shall not apply to any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of six hundred dollars a week." § 198–c(3) (emphasis added). Like the language in § 192(2), by excluding executives and professionals from *that section,* the language in § 198–c suggests that those individuals would otherwise fall under the § 190(2) definition of "employee."

To summarize, executives, administrators, and professionals are specifically excluded from only the three provisions of Article 6 discussed above: §§ 190(7), 192(2), and 198–c(3). In addition, the definition in § 190(6) of "commission salesman" excludes "*employee[s]* whose principal activity is of a *supervisory, managerial, executive,* or *administrative* nature." (emphasis added). Each of these sections makes exclusions that are specifically for purposes of *that section* only.

### 2. "*Employee" Elsewhere in the Labor Law*

The Labor Law is divided into 40 separate Articles, of which Article 6 is one. Article 1, § 2(5) defines "employee," as used throughout the entire Labor Law, as "a mechanic, workingman or laborer working for another for hire." Although the definitions provided by § 2(5) are general definitions applicable to the entire Labor Law, the definitions found in § 190 are expressly intended to be used solely in Article 6. *See id.* § 190.

In fact, in Article 6, the drafters adopted a definition of "employee" much broader than the chapter's general definition found in § 2(5). The legislative history accompa-

nying the enactment of Article 6 states that "it is necessary to know that employee is defined in an earlier section of the Labor Law as a laborer, workingman or mechanic." 1966 N.Y. Legis. Ann., at 246 (citing Assem. Intro. 5231, Print 7072). The Article 6 drafters were evidently aware of the general definition of "employee" elsewhere in the statute and, the Court must presume, deliberately expanded the definition for purposes of Article 6 to include "*any* person employed for hire by an employer." § 190(2) (emphasis added).

A few, but not all, other Articles of the Labor Law contain definitions of "employee" intended to be used in each respective Article that also differ from the § 2(5) general definition. The fact that only a few Articles have an Article-specific definition of "employee" suggests that the drafters of those Articles purposefully deviated from the general definition. Article 19, the "Minimum Wage Act," § 651(5), for example, defines "employee" as "any individual employed or permitted to work by an employer in any occupation...," subject to several exceptions for specific categories of employment, one of which includes "any individual who is employed or permitted to work ... in a bona fide executive, administrative, or professional capacity...." N.Y. Lab. Law. Art. 19, § 651(5). Section 701(3)(a) of Article 20, the "New York State Labor Relations Act," also specifically defines "employee" for the purposes of that article. In a similar vein,, Article 20–b, the "Psychological Stress Evaluators and Employment Law," § 733(2), defines "employee" simply as "an individual employed by an employer." N.Y. Lab. Law Art. 20–B, § 773(2).

### 3. *The Purposes of Article 6*

A broad examination of the purposes of Article 6 helps to inform the debate and confirms that the statute does not intend a general exclusion of executives and professionals from its coverage. First, the purpose of the sub-categories of "employees" in § 190(4)—(7), "manual worker," "railroad worker," "commission salesman," and "clerical or other worker" is not to provide an exhaustive list of types of employees included in Article 6, nor to generically exclude executives and professionals from the benefits and obligations the statute creates, but rather to delineate narrow sub-categories of employees for whom specific relief or benefits may be granted under certain sections of Article 6. For example, § 191(1), the only provision of the statute that mentions each of those subcategories in prescribing a particular requirement, states that "[e]very employer shall pay wages in accordance with the following provisions," and then lists the rules for payment of wages applicable to each of the four sub-categories of "employee" defined in § 190(4)—(7). Thus, the definitions in § 190(4)—(7) are not intended to limit the scope of the deliberately broad definition of "employee" as given in § 190(2), but to define the categories for which the payment of wages is regulated by the particular method prescribed in § 191(1). In this regard, the meaning and purpose of § 190(7) becomes clearer. That subsection defines "clerical or other worker" and is generally cited as the source for the claimed categorical exclusion of executives and professionals from the provisions of Article 6. However, read contextually in § 191(1) as one of four sub-categories of employees entitled to be paid only in the manner the statute details, the provision suggests that the exception for executives and professionals in § 190(7) is designed to exempt those employees from the method of payment of wages that employers must adopt for such employees, and not as a qualification on the definition of employee that reverts back to § 190(2) and thus modifies the reference to "employee" in every other provision of Article 6.

Second, Article 6 operates to identify the relevant persons and entities the statute encompasses, and to distinguish among the benefits and obligations to which they are subject. It divides that covered universe into employees and employers for purposes of the payment of wages. Among persons employers may hire for services, the statute implicitly distinguishes between those who qualify as salaried employees and those who serve as consultants, as well as between private and public employees. As between an employer and an employee, an executive or professional falls on the employee side in the sense that the person works for and receives wages from the employer as defined. An executive or professional may hire subordinate staff and assistants, but that does not necessarily transform that managerial person into an "employer" as that term is defined in § 190(3).

Among the specific rights and duties Article 6 prescribes are the provisions prohibiting differential pay of employees based on sex that are contained in § 194. No specific exception is made in that section for executives and professionals. It would be illogical to suppose that the legislature intended to deny that category of persons employed in the workforce the protections of that prohibition, and thereby give employers a license to discriminate in pay on sexual grounds, by categorically excluding executives and professionals from the definitions of employees contained in another provision of the statute that is apparently designed for an entirely different purpose. That result, however, would follow as a logical consequence of the argument that the exclusion of executives and professionals set forth in § 190(7) is intended to generically modify all references to "employee" in every provision of Article 6.

### 4. Caselaw Addressing the Definition of "Employees"

New York State and federal courts that have considered the scope of the definition of "employee" in Article 6 have reached different conclusions as to whether professionals, executives and managers fall within the meaning of that term. The decision of the New York Court of Appeals in *Gottlieb v. Kenneth D. Laub & Co., Inc.*, 82 N.Y.2d 457, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993), has exacerbated this disagreement. Most pre-*Gottlieb* courts interpreted the Article 6 definition of "employee" broadly to include executives and professionals. However, since *Gottlieb*, by reason of some ambiguous, perhaps unintended language in the opinion, many courts have read the definition of "employee" in Article 6 more narrowly. A brief history of decisions addressing the issue both before and after *Gottlieb* is relevant.

#### a. Pre–Gottlieb Decisions

A few pre-*Gottlieb* courts read the definitions in § 190 narrowly to exclude from the general category of "employees" individuals who did not fall into one of the more specific categories in § 190(4), (5), (6), or (7). *See Conticommodity Serv., Inc. v. Haltmier*, 67 A.D.2d 480, 416 N.Y.S.2d 298, 299 (2d Dep't 1979) (holding that an account executive at a commodities brokerage firm who received all his salary from commissions but acted in an administrative or executive capacity was not an "employee" for purposes of N.Y. Labor Law § 193 because he was excluded from the definition of "commission salesman" by N.Y. Labor Law § 190(6)); *see also, Nicoletti v. E.F. Hutton & Co.*, 761 F.Supp. 312, 314 (S.D.N.Y.1991) (refusing to overturn an arbitration decision ruling that Article 6 did *not* apply to employees working in an executive capacity, reasoning that

the law on whether an executive was covered by the statute was "far from settled").

However, most courts before *Gottlieb* interpreted the definition of "employee" more broadly to encompass executives and professionals unless explicitly excluded. In *Daley v. The Related Cos., Inc.*, 179 A.D.2d 55, 581 N.Y.S.2d 758 (1st Dep't 1992), the First Department overruled a lower court decision that denied Article 6 recovery to a plaintiff who was employed in an executive capacity. In *Daley*, the court applied the sub-categories defined in § 190(4)—(7) only to the sections of Article 6 in which the sub-categories were specifically used, and applied the broad definition of "employee" everywhere else in the statute. Thus, the court concluded that whether the plaintiff was an executive or supervisor was relevant to his recovery under § 191, which deals with frequency of salary payments and provides protection *only* for the four sub-categories of employees, some of which specifically exclude executives and professionals. However, the plaintiff's status as an executive was irrelevant to his recovery under § 198, which does not list the sub-categories defined in § 190(4)—(7), but instead uses the broader term "employee." The court further reasoned that because § 192(3) specifically excludes "any person employed in a bona fide executive, administrative, or professional capacity whose earnings are in excess of three hundred [now six hundred] dollars a week," the legislature did not intend for this restriction to apply to the entire statute. The court concluded that § 198(1–a) applies "equally to all employees." *Id.*, 581 N.Y.S.2d at 760.

In the cases that followed *Daley* but preceded *Gottlieb*, the consensus was that § 190 encompassed all employees, including executives and professionals. In *Metchick v. Bidermann Indus.*, No. 91 Civ. 2329, 1993 WL 106139 (S.D.N.Y. Apr. 7, 1993), a court in this District first noted

that "the language of § 190(2) appears on its face to include all hired employees." *Id.* at *3. The court then examined § 190(7), the definition of "clerical or other worker," and determined that the language "implies that an individual employed in an 'executive, administrative, or professional capacity' is nonetheless an 'employee' within the meaning of the statute." *Id.; see also Lumet v. SMH (U.S.), Inc.*, No. 91 CIV. 3369, 1992 WL 380004, at *13 (S.D.N.Y. Dec.4, 1992) (citing *Daley* and holding that a broad construction of the term "employee" is consistent with authority in this District); *Evans v. Ocwen Fin. Corp.*, No. 89 Civ. 7884, 1993 WL 319181, at *1 (S.D.N.Y. Aug.19, 1993) (holding that "executives are within the class of employees protected by § 198(a–1)") (citing *Daley*, 581 N.Y.S.2d at 760).

Even before *Daley*, the majority of courts interpreted § 190(2) broadly to include all employees. In *Falk v. FFF Industries*, 731 F.Supp. 134 (S.D.N.Y.1990), the court examined the text of § 190, finding that "employee" was a broad term intended to apply to "all personnel for hire" and rejecting the argument that the restrictions on "commission salesman" were intended to apply to any other type of employee. *Id.* at 142; *see also Gerlach v. The Horn & Hardart Co.*, 683 F.Supp. 342, 346 (S.D.N.Y.1988); *Dean Witter Reynolds, Inc. v. Ross*, 75 A.D.2d 373, 429 N.Y.S.2d 653, 657 (1st Dep't 1980); *Williams v. AGK Communications*, 143 Misc.2d 845, 542 N.Y.S.2d 122, 124–25 (Sup.Ct.1989); *Klepner v. Codata Corp.*, 139 Misc.2d 382, 527 N.Y.S.2d 158 (Sup.Ct. 1988), *aff'd* 150 A.D.2d 994, 542 N.Y.S.2d 1004 (1st Dep't 1989); *Maggione v. Bero Constr. Corp.*, 106 Misc.2d 384, 431 N.Y.S.2d 943 (Sup.Ct.1980).

b. *Gottlieb v. Laub & Co., Inc.*

In *Gottlieb*, the New York Court of Appeals considered the question of whether a

plaintiff can recover attorney's fees and liquidated damages under N.Y. Lab. Law § 198(1–a) [1] if he or she alleges a common-law contract claim but does not allege any substantive claim under Article 6. The court held that "remedies provided in § 198 were intended to be limited to claims based upon substantive violations of [Article 6]." *Gottlieb*, 605 N.Y.S.2d 213, 626 N.E.2d at 32–33. The bulk of the opinion addresses the issue of whether awards of attorney's fees under Article 6 should apply to successful substantive claims that do not allege a direct violation of Article 6. In discussing the plain language, history, and purpose of § 198(1–a), however, the court stated that "[e]xcept for manual workers, all other categories of employees entitled to statutory protection *under Labor Law § 191* are limited by definitional exclusions of one form or another for employees serving in an executive, managerial or administrative capacity...." *Id.*, 605 N.Y.S.2d 213, 626 N.E.2d at 32 (citing Labor Law § 190(5),(6),(7)) (emphasis added). The court further stated that Article 6 does not provide any remedy for employees who are in other respects excluded from wage enforcement protection. *Id.*

### c. *Post–Gottlieb Decisions*

Some courts have read *Gottlieb* to mean that executives, administrators, and managers are excluded from the definition of employees in § 190(2). In *Rice v. Scudder Kemper Inv., Inc.*, No. 01 Civ. 7078, 2003 WL 21961010 (S.D.N.Y. Aug. 14, 2003), the court interpreted *Gottlieb* as conclusively excluding executives and supervisory personnel from the protections of Article 6. The court relied on its reading of *Gottlieb* when deciding that the definition of "cleri-

cal or other worker" in § 190(7) modifies the definition of "employee" in § 190(2) by including all employees not otherwise included, "*except* any person employed in a bona fide executive, administrative or professional capacity." *Id.* at *3 (emphasis in original). The court interpreted the broad definition of "employee" in § 190(2) as a limitation on the type of employer-employee relationships intended to be covered by Article 6, which is further narrowed by the more specific sub-sections. *Id.; see also, DeLeonardis v. Credit Agricole Indosuez*, No. 00 Civ. 0138, 2000 WL 1718543 (S.D.N.Y.2000) (citing *Gottlieb*, 605 N.Y.S.2d 213, 626 N.E.2d at 32, in support of proposition that "employees serving in an executive, managerial or administrative capacity" are excluded from Article 6); *Alter v. Bogoricin*, No. 97 Civ. 0662, 1997 WL 691332, at *13 (S.D.N.Y. Nov. 6, 1997) (stating without analysis that "[in] *Gottlieb*, the Court of Appeals recognized that the Labor Law does not apply to 'employees serving in an executive, managerial or administrative capacity.'") (citing *Gottlieb*, 605 N.Y.S.2d 213, 626 N.E.2d at 32); *Kaplan v. Aspen Knolls Corp.*, 290 F.Supp.2d 335 (E.D.N.Y.2003) (same); *Cohen v. Fox–Knapp, Inc.*, 226 A.D.2d 207, 640 N.Y.S.2d 554 (1st Dep't 1996) (same).

In *Taylor v. Blaylock & Partners, L.P.*, 240 A.D.2d 289, 659 N.Y.S.2d 257 (1st Dep't 1997), the court denied Article 6 recovery to a co-director/ manager of a real estate financing group. The court cited *Gottlieb* to support its argument that recovery under Article 6 is limited to claims based on substantive provisions of Article 6, but cited to *Fox–Knapp, not Gottlieb*, when stating that recovery under

---

**1.** New York Labor Law § 198(1–a) provides that "[i]n any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's

failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due."

Article 6 excludes an executive's salary. *Id.,* 659 N.Y.S.2d at 260.

Nonetheless, *Gottlieb* has not been uniformly interpreted to hold the broad exclusion of executives and professionals some courts have attributed to it. Even after *Gottlieb,* several courts have followed the holding in *Daley* that Article 6 applies to all employees, and have read *Gottlieb* to restrict a plaintiff's recovery of attorney's fees under Article 6 only with respect to that portion of fees arising out of substantive Article 6 claims. *See Parker v. Revlon, Inc.,* 211 A.D.2d 415, 621 N.Y.S.2d 306, 307 (1st Dep't 1995) (stating that the purpose of the statute is to protect employees, including executives) (citing *Daley*); *Cohen v. Stephen Wise Free Synagogue,* No. 95 Civ. 1659, 1996 WL 159096, at *4 (S.D.N.Y. Apr. 4, 1996) (stating that the "weight of authority" is that "the term employee for Article 6 purposes is not limited to non-supervisory employees, but rather includes all persons employed for hire.") (citations omitted); *Tuttle v. Geo. McQuesten Co.,* 227 A.D.2d 754, 642 N.Y.S.2d 356, 358 (3d Dep't 1996) (finding that "since the specific statutory violations alleged here make continual reference to the general term 'employee,' . . . [executive] plaintiff must be afforded statutory protection.").

### d. *Gottlieb's Impact on the Definition of "Employee"*

Although many courts have interpreted *Gottlieb* to exclude executives and professionals from the definition of "employee" for the purposes of Article 6, the *Gottlieb* court's assertion that employees entitled to protection under § 191 are "limited by definitional exclusions of one form or another" is not inconsistent with a broad reading of the definition of "employee" elsewhere in Article 6. *Id.* Indeed, recovery under § 191(1) is limited to those individuals who meet the definition of a "manual worker," "railroad worker," "commission salesman,"

or "clerical or other worker," as defined in § 190(4)—(7). Lab. Law. §§ 191(1); 190(4)—(7). Further, § 191(2) provides that *"no employee* shall be required as a condition of employment to accept wages at periods *other than as provided in this section."* Lab. Law. § 191(2) (emphasis added). Because regulations are specified *only* for the four narrow sub-categories of employees, and not for "employees" generally, the only employees who could even potentially accept wages "as provided in this section" are those who qualify under the four narrow sub-categories listed in § 191(1).

Sub-section 191(3), which regulates employer conduct upon employee termination, similarly restricts recovery pursuant to that section by providing that every employer must pay wages "not later than the regular pay day for the pay period during which the termination occurred, *as established in accordance with the provisions of this section."* Lab. Law § 191(3) (emphasis added). Because only the four specific sub-categories of employees listed in § 191(1) have pay days "established in accordance with the provisions of *this section,"* only the four specific sub-categories of employees can recover under § 191(3). *Id.* Sub-sections 191(1), (2), and (3) constitute the entirety of § 191.

An analysis of each sub-section of § 191 reveals that only the four enumerated sub-categories of "employee" as defined in § 190(4)—(7) are able to recover under § 191. The *Gottlieb* court's reference to § 191's "definitional exclusions of one form or another" is entirely consistent with this broader reading of the definition of "employee" for Article 6. The restriction of § 191 to the four sub-categories of "employee" does not mean that those limitations apply to all of Article 6. Notably, the *Gottlieb* court did not say "all other categories of employees entitled to statutory

protection *under Article 6* are limited by definitional exclusions of one form or another for employees serving in an executive, managerial or administrative capacity...." Instead, the court's statement is confined to employees entitled to protection *under Labor Law § 191. Gottlieb,* 605 N.Y.S.2d 213, 626 N.E.2d at 32. In fact, nothing in the *Gottlieb* opinion excludes managers or professionals from recovery under Article 6 generally. Only subsequent lower court interpretations of the *Gottlieb* opinion have defined "employee" to exclude those individuals.

This analysis persuades the Court that the text of Article 6, as well as its context, and weight of caselaw applying the statute, support a broad interpretation of the definition of "employee," and the conclusion that executives, professionals, managers and administrators are not categorically excluded from the definition of "employee" in § 190(2) of Article 6. Accordingly, Defendants' motion for summary judgment on Miteva's New York Labor Law claim is denied.

## C. *TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS*

▮ To state a claim for tortious interference with prospective business relations, the plaintiff must show "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir. 2000). For purposes of this motion, Loeb is challenging only the third element, that he acted with the "sole purpose" of harming Miteva or used "dishonest, unfair, or improper means" to affect Miteva's business relationship with SAC. (Def. Memo. at 13.) In lieu of the "dishonest, unfair, or improper means" standard, some courts require the plaintiff to show that "the defendant's interference with its prospective business relations was accomplished by 'wrongful means.'" *See, e.g., Snyder v. Sony Music Entm't, Inc.,* 252 A.D.2d 294, 684 N.Y.S.2d 235, 239 (1st Dep't 1999). "Wrongful means" is defined as "physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure, but more than simple persuasion is required." *Id.* The parties agree that which of these two articulations of the standard the Court chooses to apply is irrelevant because under New York law, both "dishonest, unfair, and improper means" and "wrongful means" include the misrepresentation that Miteva alleges. (Def. Memo. at 13, fn. 4; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Pl.Memo.") at 9, fn. 4.)

### 1. *Wrongful Means*

The issue of "wrongful means" is generally an issue of fact, capable of being proved true or false. *See Martin Food Distribs., Inc. v. Berkowitz,* 284 A.D.2d 240, 726 N.Y.S.2d 648 (1st Dep't 2001); *Hayes v. Case–Hoyt Corp.,* 262 A.D.2d 1018, 692 N.Y.S.2d 292, 293 (4th Dep't 1999); *see also Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 286 F.Supp.2d 309, 320–21 (S.D.N.Y.2003); *Perry v. Int'l Transp. Workers' Fed.,* 750 F.Supp. 1189 (S.D.N.Y.1990).

Miteva alleges that Loeb's statement that she "consistently lost Third Point money" was false, and thus was a misrepresentation constituting "wrongful means" for the purposes of her tortious interference claim. While Miteva admits that some of her ideas lost money for the company, she alleges that that "was totally normal for the business." (Miteva Deposition dated Dec. 17, 2003, at 684–85, at-

tached as "Miteva Dep." to Hecker Dec.) Miteva insists that her overall performance at Third Point was good, as demonstrated by Loeb's own actions, including increasing her salary and compensation twice in two years and offering her a contract to induce her to stay with the company when she threatened to leave. Thus, she argues, Loeb's statement that she "consistently" lost money for the company is false.

Miteva further claims that Loeb's statement to Conheeney that she "wanted to be more of a portfolio manager than an analyst" was false. As evidence that Miteva wanted to be a portfolio manager, not an analyst, Loeb points to the contract signed by Miteva and Third Point in July 2002 which guaranteed Miteva a portfolio to manage. Miteva denies that she wanted to be a portfolio manager, and asserts that she only wanted the contract to provide a portfolio for her to manage so that her 2003 performance bonus would not be based on Loeb's unlimited discretion.

■ Loeb's statements were "misrepresentations" if they were knowingly false statements of fact. *See* Rest. Torts 2d § 767, cmt. clause (a) ("A representation is fraudulent when, to the knowledge and belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient."). A statement is a fact rather than an opinion if (1) the statement has a readily understood meaning, (2) the statement is capable of being proved false, and (3) the context of the statement does not signal to its recipient that the statement is an opinion. *See Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir.1997). Whether Miteva "consistently lost Third Point money" and whether she "wanted to be more of a portfolio manager than an analyst" are

statements that have readily understood meanings, are capable of being proved true or false by reference to the totality of the relevant circumstances, and present no ambiguity as to whether they are intended to be solely opinion.

■ Because Loeb's statements are factual, whether he believed that these statements were true is also relevant. Miteva alleges that Loeb knew that his statement that she had "consistently lost him money" was false. However, Loeb alleges that Miteva did in fact consistently lose money for Third Point. Whether Loeb's statements were false and whether Loeb knew that his statements were false are contested issues of fact that are material to resolving Miteva's tortious interference claim, and therefore submission of these contested facts to a jury is appropriate.

### 2. *Sole Purpose*

■ Miteva alleges that Loeb contacted Conheeney with the "sole purpose" of harming her. Loeb relies on *Protic v. Dengler*, 46 F.Supp.2d 277 (S.D.N.Y.1999), and *Snyder*, 684 N.Y.S.2d 235, to support his assertion that there is no triable issue of fact regarding whether he contacted Conheeney with the "sole purpose" of harming Miteva. In *Snyder*, after the lower court denied summary judgment on the defendant's tortious interference with prospective economic advantage claim,[2] the appellate court reversed the lower court's decision because the defendant had submitted evidence "providing legitimate, nontortious reasons" for the defendant's actions and because the plaintiff had not raised a triable issue of fact. *Snyder*, 684 N.Y.S.2d at 239. Like the defendant in *Snyder*, Loeb alleges "nontortious rea-

---

**2.** The elements of a claim for "tortious interference with prospective economic advantage" are essentially the same as those in a claim for "tortious interference with prospec-

tive business relations." *See Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir.2002) (citing *Nadel*, 208 F.3d at 369, for the elements).

sons" for his actions. Unlike the plaintiff in *Snyder*, however, Miteva has raised a triable issue of fact as to the legitimacy of Loeb's actions by alleging that Loeb's suggested motives were not legitimate. Whether Loeb's proffered motives were "legitimate" constitutes an issue of material fact.

In *Protic*, the court stated that, in a claim for tortious interference with prospective business relations, "the presence of any other motive, even coupled with an intention to inflict harm, is fatal to a claim." *Protic*, 46 F.Supp.2d at 279. It is true that Loeb has alleged a motive in contacting Conheeney other than harming Miteva, namely, "to provide the very reference information that was requested of him." (Def. Memo. at 20.) However, the plaintiff in *Protic* did not challenge the defendant's additional alleged motives and therefore did not create triable issues of fact as to whether the defendant acted "solely" to harm the plaintiff. That is not the case here. The facts on the record here indicate that it was Loeb who initiated the call to Conheeney after Loeb had talked to Patty and declined to give any details about Miteva's employment. At the time of that call, Conheeney was not even aware of who Miteva was. What Loeb may have had in mind in pursuing this course of action raises substantial questions about the nature of his motive. Miteva has created an issue of fact by challenging Loeb's alleged motive in contacting Conheeney.

With respect to a claim of tortious interference with prospective business relations, whether the defendant acted with the "sole purpose" of harming the plaintiff is a question of material fact. *See, e.g., A.F.C. Enters., Inc. v. N.Y. City Sch. Constr. Auth.*, No. 98 Civ 4534, 2001 WL 1335010 (E.D.N.Y 2001); *Anas v. Brown*, 269 A.D.2d 761, 702 N.Y.S.2d 732 (4th Dep't 2000); *Glen Cove Assocs. L.P. v. N.*

*Shore Univ. Hosp.*, 240 A.D.2d 701, 659 N.Y.S.2d 316 (2d Dep't 1997). Miteva creates an issue of fact by challenging Loeb's alleged other motive. There is ample evidence in the record—including Loeb's email exchanges, his contacting Conheeney after refusing to answer Patty's questions, and his apparent frustration over Miteva's other employment—from which that a reasonable jury could find that Loeb acted with the "sole purpose" of harming Miteva. Accordingly, Loeb's motion for summary judgment on Miteva's claim of tortious interference with prospective business relations is denied.

## D. PUNITIVE DAMAGES

Punitive damages are available in tort actions "where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime." *Prozeralik v. Capital Cities Comm., Inc.*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 225–26, 626 N.E.2d 34 (1993) (quoting Prosser and Keeton, Torts § 2 at 9 (5th ed.1984)). "Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton." *Id.*, 605 N.Y.S.2d at 226, 626 N.E.2d 34.

Punitive damages are available in actions for tortious interference with prospective business relations. *See, e.g., Carvel Corp. v. Noonan*, 350 F.3d 6, 24 (2d Cir.2003) (stating that "it seems clear that a jury may award punitive damages in an ordinary claim for intentional interference with economic relations"); *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir.1994) (upholding an award of punitive damages that had been reduced by the district court because the jury could have found that the

defendants acted "egregiously"); *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 38 (S.D.N.Y. 1992) ("Punitive damages are available for slander and tortious interference with pre-contractual relations.") (citations omitted).

Viewing the evidence in the light most favorable to Miteva, the Court is persuaded that there are sufficient facts in the record to permit a reasonable jury to find that Loeb's conduct was willful or wanton or that he acted with malice or with fraudulent or evil motive, and thereby sustain an award of punitive damages. *See Kerzer*, 156 F.3d at 400. Defendants' motion to bar Miteva's claim for an award of punitive damages is denied.

## III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the motion of defendants Third Point Management Company, L.L.C. and Daniel Loeb ("Defendants") for summary judgment on the claims of plaintiff Youlia Miteva ("Miteva") for violations of the New York Labor Law and tortious interference with prospective business relations ("Tortious Interference") is denied; and it is further

**ORDERED** that the motion of Defendants to preclude Miteva from seeking punitive damages in connection with her claim for Tortious Interference is denied; and it is further

**ORDERED** that, on Miteva's consent, Miteva's claim for breach of the implied covenant of good faith and fair dealing is dismissed.

The parties are ordered to appear before the Court for a status conference on July 13, 2004 at 3:45pm.

**SO ORDERED.**