**SCUTTI ENTERPRISES, LLC,**
**Plaintiff–Appellant,**

v.

**PARK PLACE ENTERTAINMENT CORPORATION and Park Place Akwesasne Consulting Corp., Defendants–Appellees.**

**No. 02–7371.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 2002.

Decided: Feb. 28, 2003.

David L. Rasmussen, Pittsford, N.Y. (Glenn M. Fjermedal, Harris Beach LLP, of counsel), for Plaintiff–Appellant.

George F. Carpinello, Albany, N.Y. (Martin G. Deptula; Paul R. Verkuil, New York, NY; David Boies, Armonk, NY; Boies, Schiller & Flexner, LLP, of counsel), for Defendants–Appellees.

Before WALKER, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

OAKES, Senior Circuit Judge.

Plaintiff Scutti Enterprises, LLC ("Scutti") sued defendants, claiming, *inter alia,* that they interfered with Scutti's contractual and prospective business relationship with the St. Regis Mohawk Tribe concerning the management of the Mohawk Bingo Palace. The United States District Court for the Western District of New York, Michael A. Telesca, *Chief Judge,* dismissed Scutti's entire case for failure to state a claim upon which relief could be granted. Scutti has appealed the dismissal of its causes of action for intentional tortious interference with contractual relations and for intentional tortious interference with prospective business relations. We agree with the district court that Scutti cannot sustain its contractual claim, but find that its prospective business relationship claim should be allowed to proceed beyond the pleading stage. Accordingly, we affirm in part, and vacate and remand in part.

## BACKGROUND

The St. Regis Mohawk Reservation is located in upstate New York and in Canada, with its United States portion known as Akwesasne. There are several gaming casinos in operation on the Reservation, including the Mohawk Bingo Palace, which is a Class II gaming facility under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, offering bingo games and Class II video lottery terminals ("VLTs"). The Bingo Palace is owned by the St. Regis Mohawk Tribe (the "Mohawks").

In the mid–1990s, Scutti negotiated with the Mohawks to redevelop the Bingo Palace, entering into a "Proposed Casino Management Contract" in 1997 in which Scutti agreed to manage the facility and to expand its gaming enterprises to include Class III gaming.[1] In order to obtain Class III gaming certification, the proposed contract between Scutti and the Mohawks was subject to review and approval by the National Indian Gaming Commission ("NIGC"), the federal agency responsible for overseeing gaming. The proposed contract expressly provided that it would not be effective or binding on either party until NIGC approval was granted. Scutti and the Mohawks executed an amended and restated proposed contract, containing the same terms and conditions as the first, in October 1998.

In anticipation of NIGC approval, Scutti invested in the preparation of business plans and environmental assessments for the expansion project. In June 2000, while still awaiting NIGC approval, Scutti and the Mohawks discussed the possibility of continuing to operate the Bingo Palace just as a Class II facility. Scutti determined that, in order to make such a facility economically viable, the Bingo Palace would need 500 new state-of-the-art VLTs.

Meanwhile, in April 2000, the Mohawks entered into an agreement with the defendants, Park Place Entertainment Corporation and Park Place Akwesasne Consulting Corp. (collectively "Park Place"), involving

---

1. Class III gaming covers types of gambling other than bingo and games similar to bingo, and includes games such as roulette, craps and blackjack. *See* 25 U.S.C. § 2703(8).

the development and management of all Class II and Class III casinos owned by the Mohawks. The agreement specifically excluded the Bingo Palace, the Akwesasne Casino, and a proposed casino in the Catskills which has been the subject of subsequent litigation. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001) ("Catskill I"); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F.Supp.2d 696 (S.D.N.Y.2001) ("Catskill II"); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 217 F.Supp.2d 423 (S.D.N.Y.2002) ("Catskill III"). This agreement was restated and ratified, with some modifications not relevant to this appeal, in March 2001.

The same day, Park Place and the Mohawks entered into a contract regarding the Akwesasne Casino, a Class III gaming facility which is located on the Reservation less than 20 miles from the Bingo Palace. In the Akwesasne contract, Park Place agreed to provide consulting and management services at the Akwesasne Casino, and to loan the Mohawks $6 million for capital improvements to the facility. The Mohawks, in turn, agreed not to increase the number of VLTs at the Bingo Palace and not to open or operate another Class III casino within 20 miles of the Akwesasne Casino. This contract remained in place until November 2001, at which point it was amended by the parties to remove the above obligations and restrictions.

In August 2001, NIGC approval for the Bingo Palace still had not been obtained. At that time, Scutti wrote a letter to the NIGC withdrawing its request to have the Bingo Palace approved for Class III gaming. Scutti also indicated in the letter its intention to continue to pursue the revival and expansion of the Bingo Palace as a viable Class II facility.

Scutti filed the present action against Park Place in New York state court in October 2001, alleging that Park Place's restriction in the Akwesasne contract on the number of VLTs at the Bingo Palace constituted tortious interference with Scutti's contractual and prospective business relations, unfair competition, and anti-competitive behavior. Park Place removed the case to the Western District of New York and filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) in lieu of an Answer.

On March 11, 2002, the district court granted Park Place's motion and dismissed Scutti's case with prejudice. With respect to the cause of action for interference with contractual relations, the district court found that Scutti's 1997 proposed agreement with the Mohawks was not a binding contract in the absence of approval from the NIGC, which was never obtained. With respect to the interference with business relations claim, the district court found that Scutti could not demonstrate that "wrongful means" were employed by Park Place because Park Place had a legitimate business interest in securing its loan for the Akwesasne Casino by restricting the number of VLTs at the Bingo Palace. Scutti has now appealed the dismissal of these two causes of action.

## DISCUSSION

■ We review *de novo* the grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor. *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002). "The court may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (internal quotation omitted).

Complaints alleging torts are held to the less stringent notice requirements of Rule 8(a)(2), "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "The rule is fashioned in the interest of fair and reasonable notice, not technicality.... More extensive pleading of fact is not required because the Federal Rules of Procedure provide other devices besides pleadings that will serve to define the facts and issues and to dispose of unmeritorious claims." 2 James Wm. Moore, et al., Moore's Federal Practice § 8.04[1] (3d ed.1999) (citation omitted); *see also Wade v. Johnson Controls,* 693 F.2d 19, 21–22 (2d Cir.1982). We note that while Scutti's complaint and briefs present a torts claim, they occasionally allege that Park Place committed fraud, which implicates the more stringent requirements of Fed. R.Civ.P. 9(b). However, Park Place does not dispute on appeal Scutti's argument that its complaint is governed by Rule 8(a).

■■ Turning first to the claim for tortious interference with contractual relations, it is clear that a central requirement for this cause of action under New York law is the existence of a valid, enforceable contract between the plaintiff and a third party. *See Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (1993); *see also Int'l Minerals & Res., S.A. v. Pappas,* 96 F.3d 586, 595 (2d Cir.1996). The district court found that under its unambiguous terms, Scutti's proposed contract with the Mohawks was not effective or binding—and therefore not enforceable—until approved by the NIGC. It is not disputed that NIGC approval of the proposed contract was never obtained.

Although Scutti makes several arguments as to why this lack of approval should not be determinative of its claim, we agree with the district court that, in the absence of an enforceable contract, it was appropriate to dismiss Scutti's cause of action for tortious interference with contractual relations.[2]

■■ The lack of a valid contract, however, is not a barrier to a claim for tortious interference with business relations. *See Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 205 (2d Cir.1998). Indeed, Scutti "can recover if [it] can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Id.* (quoting Restatement (Second) of Torts § 766B cmt. c (1979)).

■ To state a claim for tortious interference with business relations under New York law, four conditions must be met:

(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.

*Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir.2002); *see also Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108–09 (2d Cir.1997). As the parties here recognize, there is no dispute that three of these four conditions are satisfied in the present case. It is the third condition, namely, the methods employed by Park Place in its dealings with the Mohawks, that is contested.[3]

---

**2.** The district court in *Catskill I* reached the same conclusion with respect to the plaintiff's claim in that case, finding that "[m]anagement agreements that do not have NIGC approval are void and unenforceable" and that therefore there was no contract with which

Park Place could interfere. 144 F.Supp.2d at 232–33; *see also* 25 C.F.R. § 533.7 (2002).

**3.** On appeal, Scutti does not argue that Park Place's "purposes" were wrongful under the third condition for tortious interference with

■ Park Place points us to language in *PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 269 (2d Cir.1987), that states when, as here, the defendants' acts were taken to advance its own competing interests, "the claim will fail unless the means employed include criminal or fraudulent conduct." This language, however, was subsequently disavowed in our opinion in *Hannex.* There, we noted that *PPX*'s limitation was "unduly narrow" and an "apparently incorrect characterization of New York law" in light of the New York Court of Appeals's decision in *NBT Bancorp v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 586–87, 664 N.E.2d 492, 497–98 (1996). *See Hannex*, 140 F.3d at 206 n. 9. Instead, the appropriate standard is whether Park Place employed "wrongful means," defined under New York law as "representing 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract.'" *NBT Bancorp*, 664 N.E.2d at 497, 641 N.Y.S.2d at 586 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632 (N.Y.1980)). This standard "encompasses a considerably wider range of conduct" than that contemplated by PPX. *Hannex*, 140 F.3d at 206 n. 9.

Scutti alleges that the wrongful means employed by Park Place was economic pressure exerted on the Mohawks to accept the VLT limitation at the Bingo Palace, which in turn exerted economic pressure on Scutti's business plans with the Mohawks. Although "some degrees of economic pressure" has not been defined

by the New York courts, the Restatement (Second) of Torts provides the following guidance:

> The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

Restatement (Second) of Torts § 767 cmt. c (1979). The Restatement recognizes that if one competitor "succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged," while "economic pressure on the third person in matters unrelated to the business in which actor and the other compete is treated as an improper interference." *Id.* § 768 cmt. e. Therefore, the first question is whether Scutti has adequately alleged that Park Place's actions in this case rise to the level of economic pressure, or instead were simply a form of persuasion, *see Lombard*, 280 F.3d at 214–15; and the second question is whether they were related to the business in which Scutti and Park Place compete.

Scutti argues that by imposing the VLT limitation on the Bingo Palace, Park Place made Scutti's expansion project unfeasible and caused the Mohawks to abandon their agreement with Scutti. In its complaint, Scutti makes specific allegations with respect to (1) Park Place's knowledge of

business relations. Its reply brief belatedly approaches this argument, but concludes "the stricter 'sole purpose or malice' requirement ... does not apply," and returns immediately to the wrongful means argument. Accordingly, we do not address whether Scutti's complaint adequately alleged "wrongful purposes."

Scutti's plans with the Mohawks for the Bingo Palace, (2) Park Place's intent in the Akwesasne contract to limit Scutti's ability to expand the number of VLTs at the Bingo Palace, (3) Park Place's knowledge that such a limitation would effectively scuttle the Bingo Palace project, and (4) Park Place's use of financial power to restrict competition for Mohawk gaming facilities and to interfere with Scutti's preexisting business relationship with the Mohawks.

As we recognized above, a motion to dismiss should not be granted unless it appears beyond doubt that "the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory,* 131 F.3d at 329. We have said in an earlier case that mere suspicions are inadequate to support a claim for tortious interference with business relations. *See Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000). Scutti, however, has set forth more than suspicions in its allegations; it points to an explicit limitation on competition sought against it by Park Place in the Akwesasne contract. As Scutti points out, it is unclear whether the VLT limitation requested by Park Place had a legitimate business purpose or was related to any viable business interest that Park Place had in the Akwesasne casino. Although the VLT limitation appears to be related to the business in which Park Place and Scutti compete, i.e., gaming and casinos, it is not beyond doubt that Scutti could demonstrate that Park Place's loan offer, which induced the Mohawk's agreement to the limitation, was economic pressure unrelated to that business, and was wrongfully aimed at extinguishing Scutti's relationship with the Mohawks.

Based on the pleadings, we cannot say that the VLT restriction was simply a form of persuasion employed by Park Place. We therefore cannot agree with the district court that Scutti has failed in this case to allege wrongful conduct by Park Place "under any definition of that term." Rather, we find that whether Scutti's "allegations of economic pressure are of the degree necessary to sustain an action is a question of fact best answered upon summary judgment or at trial." *Drug Emporium, Inc. v. Blue Cross of W. New York, Inc.,* 104 F.Supp.2d 184, 192 (W.D.N.Y. 2000); *see also Catskill I,* 144 F.Supp.2d at 236 (denying motion to dismiss on tortious interference with business relations claim because it involved issues of fact).

Without giving any opinion as to Scutti's ability to withstand summary judgment or to prove its claim at trial, we hold that its claim for tortious interference with business relations is adequately pled to withstand a motion to dismiss. We therefore vacate the decision of the district court with respect to this claim and remand the case for further proceedings consistent with this holding.

### CONCLUSION

For the foregoing reasons, we affirm that part of the district court's judgment dismissing Scutti's claim for tortious interference with contract. We vacate that part of the district court's judgment dismissing Scutti's claim for tortious interference with business relations and remand for further proceedings.