CATSKILL DEVELOPMENT, L.L.C., Mohawk Management, L.L.C., and Monticello Raceway Development Company, L.L.C., Plaintiffs,

v.

**PARK PLACE ENTERTAINMENT CORP. Defendant.**

No. 00 CIV.8660(DM).

United States District Court, S.D. New York.

Nov. 15, 2004.

Andrew L. Frey, Mayer Brown Rowe & Maw LLP, New York City, Bethany A. Breetz, Stites & Harbison, Louisville, KY, Herbert F. Kozlov, Reed Smith, LLP, New York City, John P. Gallagher, Stites & Harbison PLLC, Atlanta, GA, Thomas P. Puccio, Law Offices of Thomas P. Puccio, New York City, Herbert F. Kozlov, Reed Smith, LLP, New York City, J. D. Humphries, III, Stites & Harbison, PLLC, Atlanta, GA, William W. Hopson, Stites & Harbison, PLLC, Atlanta, GA, for Plaintiffs.

David Boies, Boies, Schiller & Flexner, LLP, Albany, NY, for Defendant.

Daniel Aaron Seff, Barr & Associates, P.C., Stowe, VT, for Movant.

MEMORANDUM DECISION AND ORDER REVISITING THE COURT'S PREVIOUS FINDING CONCERNING EVIDENCE OF "WRONGFUL MEANS;" REINSTATING THE JUDGMENT AND DIRECTING THE CLERK OF THE COURT TO ENTER JUDGMENT FOR DEFENDANT

MCMAHON, District Judge.

On October 7, 2003, this Court issued a Memorandum Decision and Order granting plaintiffs' motion to vacate this Court's decision granting summary judgment to defendant on plaintiffs' claim of intentional interference with prospective business relations. This court had jurisdiction to enter the order because the United States Court of Appeals for the Second Circuit—where an appeal from this court's final judgment was pending—relinquished jurisdiction so that I could reopen the record and reconsider my previous finding that plaintiffs had failed to adduce evidence of "wrongful means," necessary predicate to establishing their claim of intentional interference. In the October 7 decision and order, I directed the parties to conduct limited discovery on a very tight time line and to present briefs limited to the subject of "wrongful means" so that I could decide the issue and get the case back to the Second Circuit.

An intervening event extended the schedule. On November 21, 2003, the Second Circuit certified to the New York Court of Appeals, in case entitled *Carvel Corporation v. Noonan*, 350 F.3d 6 (2d Cir.2003), the question of whether a franchisee had a valid claim for interference with prospective economic relations. The New York Court of Appeals accepted the certified question in order to clarify certain language in its controlling case, *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) and *NBT Bancorp. Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996), concerning what a plaintiff must show "where there has been no breach of an existing contract, but only interference with prospective contract rights..." *NBT, supra*, 87 N.Y.2d at 621, 641 N.Y.S.2d 581, 664 N.E.2d 492. Because the answer to that question could have proved dispositive of the question I had reclaimed this case to resolve—whether plaintiffs had raised a genuine issue of material fact concerning defendant's alleged use of "wrongful means" to induce the St. Regis Mohawk Tribe to enter into an exclusive casino development agree-

ment with Park Place—I put everything on hold pending the outcome of *Carvel.*

On October 14, 2004, the New York Court of Appeals handed down its decision in *Carvel v. Noonan*, 3 N.Y.3d 182, 818 N.E.2d 1100 (2004). I have read that decision and the briefs of the parties commenting thereon. To my great dismay, I fear I agree with plaintiffs that Judge Robert S. Smith's opinion does not set forth the sort of "bright line" test for what constitutes "wrongful means" that I was hoping for. I must, therefore, wrestle with the issue I started out to address upon vacatur of the original judgment. Judge Smith's opinion

does, however, offer me some guidance on the point, which I gratefully accept.[1]

## I. Carvel and the Concept of "Wrongful Means" in Connection with the Tort of Interference with Prospective Economic Relations

The second cause of action in the complaint in this action (the only claim with which we are concerned) alleges that Park Place intentionally interfered with plaintiffs' non-contractual but prospective business advantage with the St. Regis Mohawk Tribe in connection with the casino it proposed to develop at the Monticello Raceway in Sullivan County, New York.[2]

---

1. To avoid any confusion between the two appellate courts, all references to a "Court of Appeals" are to the New York Court of Appeals. The United States Court of Appeals for the Second Circuit is referred to as the "Second Circuit."

2. I decline to revisit my conclusion that the unapproved Land Purchase Agreement (LPA) and Development and Construction Agreement (DCA) between the Tribe and plaintiffs were not enforceable contracts. Plaintiffs invite me to alter this conclusion based on an opinion letter issued by the National Indian Gaming Commission on January 9, 2004, which held that not all "collateral agreements" between tribes and outsiders related to gaming on reservations had to be submitted for NIGC review and approval before they were valid. Plaintiffs' argument is not persuasive for three reasons. First, the NIGC opinion letter post-dates the events in issue by many years, was issued by an entirely different administration in Washington, and relates to an entirely different set of contracts between the St. Regis Mohawk and parties who are not involved in this lawsuit. Second, it is indisputably clear from the record in this case that back in the late 1990s—the relevant time period for our purposes—the NIGC *did* insist on approving collateral agreements. Plaintiffs' own behavior supports no other conclusion. Plaintiffs submitted the Land Purchase Agreement to the NIGC for its review and engaged in a lively debate with the NIGC over whether the LPA was part and parcel of the Management Agreement. The record shows that NIGC personnel viewed the LPA as an

integral part of the Management Agreement because the proposed payment for the land was viewed by NIGC personnel as a disguised management fee. Plaintiffs disputed the NIGC staff interpretation. Third, the recent opinion letter changes nothing because, had the NIGC ultimately reached the conclusion that the vastly inflated land price was really a disguised management fee, then the LPA would have been subject to approval even under the terms of that opinion letter. ("If the.....agreement existed at the time of the approval of the management contract, and if it was reviewed, *it would have been subject to approval or disapproval as a management contract if it....provided for management of the gaming operation in some manner.*") The issue of whether the LPA was part and parcel of the Management Agreement—hotly disputed between plaintiffs and the NIGC staff—had not yet been decided by the Agency when the Tribe abrogated its relationship with plaintiffs, *Catskill Development L.L.C. v. Park Place Entertainment Corp.*, 217 F.Supp.2d 423, 433 (S.D.N.Y.2002) (*Catskill III* ), and there could be absolutely no guarantee that the NIGC would have come down in plaintiffs' favor on this point. In fact, the record reveals that plaintiffs had made little headway in convincing the staff that the land purchase price was not a disguised management fee. Plaintiffs' contention that the 2004 NIGC letter should alter my analysis of the need for approval of the LPA is, therefore, without merit.

As for the DCA, as I noted in *Catskill III*, 217 F.Supp.2d at 429 n. 2, the NIGC actually made a determination that the DCA was part

■ Under New York law, a third party's interference with a prospective business relationship that has not yet been reduced to contract is actionable only in limited circumstances. To prevail on such a claim, a plaintiff must show that the defendant's conduct was "culpable." That can mean one of two things:

(1) The defendant acted for the *sole* purpose of inflicting intentional harm on the plaintiffs. Actions taken to promote the economic interest of the defendant are not taken for the sole purpose of harming the plaintiff; or

(2) The defendant effected the interference by "wrongful means."

For many years, it appeared that "wrongful means" was limited to the commission of acts that were either criminal or independently tortious. However, in *Guard–Life*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445, the New York Court of Appeals referred approvingly to Section 768 of the Restatement [Second] of Torts, the comments to which described "wrongful means" to include not only criminal acts, but "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure, . . . [but not] persuasion alone although it is knowingly directed at interference with the contract." Predictably, a question arose: since a party was privileged to attempt to procure business for itself as long as it did not interfere with a bona fide contract, what could possibly be meant by "some degrees of economic pressure?" Economic pressure was all but guaranteed in any situation where a competitor tried to step between his competitor and a third party with whom both

wished to deal. What would make such economic pressure wrongful?

My hope was that the New York Court of Appeals would answer this question definitively in *Carvel.* It did not.

*Carvel* was a suit brought by several Carvel franchisees against their franchisor, alleging that Carvel's distribution of its products through supermarkets that competed with the plaintiff-franchisees was both tortious and a violation of their franchise rights. Among the claims asserted was one for "interference with prospective economic relations" between the plaintiff franchisees and their customers. The gravamen of the claim was that Carvel induced persons who would otherwise have bought their ice cream from Carvel to purchase Carvel products in supermarkets. The New York Court of Appeals concluded that this claim was foreclosed by New York law.

The *Carvel* court did reject the plaintiff's assertion that the economic pressure exerted in that case—special offers to the supermarkets, including price concessions, that allowed them to undersell the independent franchisees and thus made the supermarkets a more attractive venue for customers—constituted "wrongful means." In so holding, the Court of Appeals did endorse the proposition that the economic pressure had to be "extreme and unfair," 3 N.Y.3d at 191, 785 N.Y.S.2d at 363, 818 N.E.2d at ——, 2004 WL 2320368 at *4, or "egregious wrongdoing, 3 N.Y.3d at 188, 785 N.Y.S.2d at 361, 818 N.E.2d at ——, 2004 WL 2320368 at *2." However, the Court of Appeals did not set limits on what kind of conduct might someday be deemed extreme and unfair or egregious. In particular, the Court refused to hold that the

---

and parcel of the Management Agreement, resolving the issue that was left unresolved with respect to the LPA, and rejecting plaintiffs' position. This means that, even under

the reasoning of the 2004 NIGC opinion, it was subject to NIGC approval. In fact, the NIGC opinion letter vindicates this Court's reasoning insofar as the DCA is concerned.

phrase "some degree of economic pressure," which appears in the Restatement [Second] of Torts, meant that conduct would not be deemed extreme and unfair or egregious unless it violates antitrust laws or other well-established principles of tort. It avoided those issues, stating, "[W]e do not decide today... whether there can ever be other instances of conduct which, though not a crime or tort in itself, ... could be the basis for a claim of tortious interference with economic relations. That is a question we leave for another day, because no such egregious conduct was shown here." 3 N.Y.3d at 190, 785 N.Y.S.2d at 362, 818 N.E.2d at ——, 2004 WL 2320368 at *3.

The Court of Appeals rejected the argument that 'Carvel's inducement to supermarkets constituted "wrongful economic pressure" for two reasons, but neither of them sheds any light on what might constitute "wrongful economic pressure" in the case before me, because they are based on facts not germane to our case.

First, in *Carvel*, the alleged economic pressure was directed at the competitor of the plaintiff, not at a third party with whom both the plaintiff and plaintiff's competitor were trying to do business. *Carvel*, 3 N.Y.3d at 188, 785 N.Y.S.2d at 361, 818 N.E.2d at ——, 2004 WL 2320368 at *2. The Court of Appeals ruled, "[T]he economic pressure that must be shown is not, as the franchisees assume, pressure on the franchisees, but on the franchisees' customers..." *Id.* 3 N.Y.3d at 191, 785 N.Y.S.2d at 363, 818 N.E.2d at ——, 2004 WL 2320368 at *4. In this case, the alleged economic pressure *was* directed at the third party "customer"—the Tribe—which had been working on a casino project with plaintiffs but transferred its allegiance to defendant.

Second, in *Carvel* the plaintiff and defendant were franchisor and franchisee,

and because of the special nature of that contractual relationship, the Court of Appeals concluded that it was neither wrongful nor unfair to relegate plaintiffs to the rights specified in their franchise agreement. Here, no analogous contractual relationship exists between the Tribe and anyone—that is precisely why plaintiffs are relegated to an interference with prospective commercial relations claim.

Thus, *Carvel*, while interesting and informative, does not definitively resolve the question before me.

## II. "Wrongful Means:" The $3 Million Payment

▊ No evidence in the record suggests that Park Place committed any criminal act to induce the Tribe to break off its relationship with plaintiffs, and it cannot be disputed that Park Place did not act solely to harm plaintiffs, but was instead promoting its own economic self-interest. But Park Place gave the Tribe a desperately-needed $3 million cash infusion to induce it to walk away from its unconsummated but long-in-the-making relationship with plaintiffs and enter into an exclusive Catskill casino development arrangement with defendant. In *Catskill III,* I concluded that plaintiffs had not raised any genuine issue of material fact concerning whether that payment constituted "wrongful means." I vacated the original judgment in favor of defendant so I could reconsider that question after plaintiffs took additional discovery.

Plaintiffs have, predictably, gone beyond that rather narrow issue and suggest that the newly-discovered evidence raises a genuine issue of fact concerning other possible "wrongful means." Before I turn to those contentions, let me revisit the issue of the $3 million payment.

The underlying facts concerning the $3 million payment have not changed since *Catskill III* was handed down. The Tribe was in financial difficulty in early 2000. It owed the State of New York $3 million arising out of the operation of its Akwesane casino on the Canadian border. Akwesane had been a poor performer for years, and there is no evidence in the record before me that Park Place was responsible for that fact. On April 7, 2000, the State explicitly demanded that the $3 million be paid. The Tribe had to come up with the money right away. The evidence shows that Tribal leaders did not view plaintiffs as a viable source of funds. Instead, they approached Park Place to ask for a loan of $3 million. Park Place agreed to give the loan, but only on the condition that the Tribe abrogate it relationship with plaintiffs and grant it the exclusive right to partner the Tribe in developing a casino in the Sullivan County.

Well prior to *Carvel*, I concluded that this sequence of events did not constitute the sort of "wrongful economic pressure" that would satisfy plaintiff's burden of proving "wrongful means" in connection with the alleged tort of interference with prospective business relations. Nothing in *Carvel* causes me to conclude that Park Place's conditioning its payment on the exclusive constitutes conduct so "egregious" or "extreme and unfair" as to rise to the level of "wrongful economic pressure." It remains undisputed that the Tribe came to Park Place for the money, not vice versa. Park Place is not a bank that makes loans to applicants. It is a business enterprise, a publicly-held corporation; it cannot make payments willy-nilly to third parties without getting something in return.

Plaintiffs, however, have more or less abandoned this "wrongful means" argument. They now rely on their alterna-tive argument that "wrongful means" analysis is not necessary, because when Park Place gave the loan in exchange for the exclusive it committed an independent tort—namely, knowing participation in a breach of fiduciary duty committed by Ivan Kaufman, the Chief Executive Officer of a third party corporation, President RC. President managed the Mohawk's Akwesane casino. In a February 16, 2000 conversation that was tape recorded, Kaufman said he was "squeezing" the Tribe in Akwesane and slowing down payrolls. I ruled (and I adhere to my prior ruling) that the fact that Park Place's general counsel, Clyde Cummis, said, "Yeah," and "Yep," in response to (or during) Kaufman's statements did not, in and of itself, support any inference that Park Place had knowingly participated in any wrongful conduct on Kaufman's part. I allowed plaintiffs to take additional discovery to see if they could turn up any hard evidence of Park Place's complicity in Kaufman's "squeezing" of the Tribe's payroll from Akwesane. Absent evidence (not speculation) about Park Place's knowing partic-ipation with Kaufman in a plot to "squeeze" the Tribe's payroll and create some economic difficulty, I intended to ad-here to my original ruling.

No such evidence has been submitted to this Court.

First, I want to make it clear that I am not concerned with whether there was ac-tually a payroll slowdown. The taped conversation at the very least creates a disputed issue of fact on that point. How-ever, to go forward on the "knowing par-ticipation in a breach of fiduciary duty" theory, there has to be evidence of two things: (1) Park Place knew about the payroll squeeze (and the tape creates at least an issue of fact as to that, too), and (2) Park Place knowingly participated in bringing the payroll squeeze about. Oth-

erwise, as far as this court is concerned, Park Place did not "knowingly *participate*" in Kaufman's alleged breach of fiduciary duty (and I will assume arguendo that slowing down the payroll, if that in fact happened, was a breach of Kaufman's fiduciary duty to the Tribe). I decline to reverse myself on two points that plaintiffs keep rearguing—that Cummis's non-commital comments, without more, are evidence that Park Place *participated in* (as opposed to *knew about*) the payroll squeeze; and that a reasonable jury would interpret his words as "advice or encouragement to act" that can qualify as "knowing participation." On the latter point, I note something that is self-evident from the tape of the February 16 conversation—the payroll squeeze had already happened—so any statement by Cummis could not reasonably be interpreted as encouraging Kaufman to initiate a payroll squeeze. If the tape is to be believed, Kaufman's payroll squeeze began sometime before Cummis allegedly offered him "moral support" by saying "Yeah" on February 16!

Plaintiffs have not adduced any evidence that Park Place consulted with Kaufman before Kaufman initiated the payroll squeeze. They have adduced no evidence that Park Place induced President to begin the payroll squeeze or took any action in connection to bring it about. So they have not adduced any evidence that Park Place knowingly induced Kaufman to breach his fiduciary duty.

Plaintiffs argue that Park Place aided Kaufman's breach of fiduciary duty by promising Kaufman that Park Place would buy out President's interest in the non-performing Akwesane casino and grant it an interest in any Catskills casino Park Place might develop. According to the evidence, Park Place made this offer on January 20, 2000. But there is no evidence that Park Place was aware on January 20 that Kaufman was engaged in, or anticipated engaging in, any payroll squeeze. Thus, the making of this offer could not possibly constitute "knowing participation" in Kaufman's alleged breach of fiduciary duty.[3]

So plaintiffs assert that, by not withdrawing this offer after Cummis allegedly learned of Kaufman's payroll squeeze on February 16, Park Place gave Kaufman "sufficient comfort to risk angering the Tribe" by breaching his fiduciary duty. With all respect to plaintiffs, this is a bootstrap that stretches the holding in *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir.1987), beyond the bounds of reason.

In *S & K*, one Johnson was an employee of S & K. Like all employees, he had a fiduciary duty to his employer. Nike had a contractual relationship with S & K, which apparently it could terminate at will. *Id.* at 845. Johnson went to Nike behind his employer's back and offered to come work for Nike and play the same role S & K was then playing pursuant to the Nike/S & K contract. Johnson induced Nike to terminate its relationship with S & K without disclosing that Nike was about to hire Johnson. The Second Circuit had little difficulty affirming a jury's conclusion that Nike had aided and abetted Johnson's breach of his duty to his employer by terminating its contract with S & K.

---

**3.** Plaintiffs allege that what Park Place hoped to get in return was an introduction to the Tribe so it could try to negotiate a deal to develop a casino in the Catskills with the St. Regis Mohawk. (Plaintiffs' Supplemental Brief on the Issue of Wrongful Means, dated December 1, 2003, at 13.) They do not explain how making such an introduction would have violated any fiduciary duty that Kaufman owed to the Tribe by virtue of President–RC's Management Agreement for Akwesane. I cannot see that it would.

Here, however, there was no agreement between Park Place and the Tribe that Park Place abrogated so it could do a deal with Kaufman. Kaufman may have owed the Tribe a fiduciary duty analogous to the one Johnson owed S & K, but in January, February and March of 2000, Park Place's only duty was to its shareholders.[4] To say that Park Place was required to withdraw its offer to President–RC when it learned of Kaufman's breach of fiduciary duty is to create a duty between Park Place and the Tribe where the law imposes none. Of course plaintiffs do argue that—they insist that a reasonable juror could conclude that Park Place engaged in "knowing participation" by exploiting the Tribe's economic position to procure the Catskill casino exclusive with knowledge of the payroll squeeze—but nothing in S & K or any other New York case suggests that a competitor who is not interfering with an enforceable contract cannot take advantage of the "customer's" known economic distress.

Moreover, plaintiffs have also adduced no evidence that Park Place received anything of value *as a result of the payroll squeeze*. Even if plaintiffs' strained reading of cases like S & K, 816 F.2d 843, and *Diduck v. Kaszycki & Sons Contractors, Inc.*, 774 F.Supp. 802 (S.D.N.Y.1991), *aff'd in part and rev'd in part*, 974 F.2d 270 (2d Cir.1992), were tenable, Park Place would have had to share in the benefits *from the breach of fiduciary duty* in order to "knowingly participate" in Kaufman's breach of fiduciary duty. S & K, 816 F.2d at 847–48 (emphasis added). Park Place's participation in the breach, as alleged by plaintiffs, lay in its making the $3 million loan in exchange for the exclusive develop-

ment right—not in taking money from President that would otherwise have been used to meet the payroll at Akwesane! (Or, more accurately, taking advantage of the float created by the delay in meeting the payroll, since plaintiffs do not suggest that the employees were not eventually paid).

In any event, Park Place's allegedly wrongful act happened because the Tribe needed a lot of money to pay the State of New York—not to meet payroll at the casino. The Tribe had fallen behind in payments to the State because the casino was in dire financial straits. And the evidence demonstrates, without dispute, that the Akwesane casino was in dire financial straits because it was a poor performer and had been for years! There is simply no evidence that the alleged payroll squeeze caused the financial problem that led the Tribe to default in making payments to the State.

The only alleged breach of fiduciary duty here is Kaufman's slowing down of the payroll. Although I vacated the original judgment and gave them every opportunity to uncover *evidence* that would link the payroll situation at Akwesane to the Tribe's need for a source of funds to make a $3 million payment to the State of New York, plaintiffs have not identified any evidence tending to show that the payroll squeeze occasioned the non-payment of the $3 million, which in turn occasioned the State's demand for payment, which in turn occasioned the Tribe's immediate need for a loan. Plaintiffs really want this court to hold that, because Kaufman told Cummis that he was squeezing the Tribe's payroll, Park Place was somehow barred from ac-

---

4. In *Catskill IV*, I rejected Park Place's argument that a claim for tortious interference with fiduciary duty would lie only if President–RC had a fiduciary duty to plaintiffs (not to the Tribe, a third party). (See opinion dated October 7, 2003, at n. 5) Now that I examine plaintiffs' argument in its fulsomeness against the facts of S & K, I am inclined to think that conclusion was erroneous. I leave the issue for the Second Circuit.

cepting the Tribe's offer of an exclusive in exchange for $3 million. That is not the law.

Plaintiffs have had ample opportunity to try to weave all these strands into a coherent story that would tar Park Place with some knowing participation (whether by orchestrating or receiving the benefits from) Kaufman's alleged payroll squeeze. They have generated a lot of smoke. They have not succeeded in raising a genuine issue of material fact on the issue of either "wrongful means" or "knowing participation in a breach of fiduciary duty." I leave intact my rulings on those issues as set forth in *Catskill III*.

### III. "Wrongful Means:" The Impact of *Scutti*

The only other point that needs to be addressed before this case returns to the Second Circuit is plaintiffs' argument that the Second Circuit's decision in *Scutti Enterprises, LLC v. Park Place Entertainment Corp.*, 322 F.3d 211 (2d Cir.2003)—a case decided after *Catskill III*—indicates that this court should have reached a different result in *Catskill III*. It does not.

In *Scutti*, the Second Circuit reversed Chief Judge Telesca's grant of a motion to dismiss for failure to state a claim of tortious interference with prospective business relationship (Fed.R.Civ.P. 12(b)(6)) and remanded the case so that discovery could be conducted into whether a limitation (the VTL limitation) in a contract between Park Place and the Mohawks concerning the Akwesane casino "had a legitimate business purpose or was related to any viable business interest that Park Place had in the Akwesane casino." *Scutti, supra*, 322 F.3d at 217. The Second

Circuit acknowledged that it "appears" that the VTL limitation had a legitimate business rationale, but said, "It is not beyond doubt that Scutti could demonstrate that Park Place's loan offer, which induced the Mohawk's [sic] agreement to the limitation, was economic pressure unrelated to that business." *Id.* The panel made it clear that it was not expressing any opinion as to the validity of Scutti's arguments, and indicated that a summary judgment motion or trial, rather than a pre-answer motion to dismiss, would be the proper vehicle for resolving that question. *Id.*

Unlike Chief Judge Telesca in *Scutti*, this court in *Catskill III* was not deciding a pre-answer motion to dismiss, but a summary judgment motion on a developed record. The record has been further developed in connection with my recall of the case in response to plaintiffs' Fed.R.Civ.P. 60(b) motion. Plaintiffs' problem is that the fully developed record does not bear out their claims. About this, *Scutti* says nothing.

### CONCLUSION

The Court having recalled this case from the United States Court of Appeals for the Second Circuit, and the parties having had an opportunity for discovery and briefing concerning the issue of "wrongful means," I adhere to my previous conclusion that defendants have not raised any genuine issue of material fact on the question of "wrongful means"—or, for that matter, on the question of the commission of any independent tort by Park Place. Therefore, I adhere to my decision granting summary judgment to defendants and dismissing the complaint in its entirety.[5]

---

5. Two more years having passed, and no casino having arisen in the Catskills—although I have read in the press that plaintiffs or their successors in interest appear to be making

more headway toward that goal in partnership with a different tribe than Park Place is making with the St. Regis Mohawk—I am more convinced than ever that Park Place

I direct the Clerk of the Court to enter an appropriate order and the parties to restore this case to the calendar in the United States Court of Appeals for the Second Circuit immediately.

was entitled to summary judgment on the ground that plaintiffs' proposed venture with the Tribe was too speculative to support an award of damages (the so-called "but for causation" argument).