**Joel FRIEDMAN, Plaintiff,**

v.

**COLDWATER CREEK, INC. and Kathy McConnell, Defendants.**

**No. 06 Civ. 4785(LAP).**

United States District Court, S.D. New York.

Jan. 28, 2008.

Kevin T. Mulhearn, Law Office Kevin T. Mulhearn, P.C., Orangeburg, NY, for plaintiff.

Glen Howard Parker, Hoey, King, Toker & Epstein, New York, NY, for defendants.

### MEMORANDUM AND ORDER

LORETTA A. PRESKA, District Judge.

Plaintiff Joel Friedman, a former account representative at Sutton Creations, Inc., filed this action against one of Sutton's customers, Coldwater Creek, and one of Coldwater's employees, Kathy McConnell (collectively, "Defendants"). Defendants moved for summary judgment, and the Court heard oral argument on December 3, 2007. For the reasons set forth below, the motion is GRANTED.

### BACKGROUND

Kathy McConnell was Vice President of Product Development for Defendant Coldwater Creek, a company that sells clothing and other items through its catalogue and

retail store outlets. (*See* McConnell Dep. 10:24–11:8, 15:13–14.) The items Coldwater sells are manufactured by and acquired from third-party vendors. (*See id.* 9:13–24.) Sutton Creations, owned by Abe Sutton and his brother, was one such vendor that sold predominantly womens' knit sportswear imported from overseas. (*See* Sutton Dep. 7:6–7; Friedman Dep. 31:4–12.)

Sutton Creations was considered a primary vendor by Coldwater Creek, who bought approximately $3.5 million in goods from Sutton Creations during 2004. (*See* Friedman Dep. 27:19–24, 28:19–29:6.) Joel Friedman was the account representative at Sutton Creations responsible for sales to Coldwater Creek. (*See id.* 29:7–14, 30:1–31:24.) Though originally responsible for sales to other customers, the volume of business generated by Coldwater Creek increased such that, by 2005, Friedman was required to focus most of his attention on that client. (*See id.* 31:13–24.)

Notwithstanding this revenue, Abe Sutton testified at his deposition that 2004 and 2005 were financially difficult years for Sutton Creations. (*See* Sutton Dep. 40:14–25.) The business was exploring ways of reducing costs, including by reviewing Friedman's employment, citing concerns about Friedman's performance as well his demeanor in the office. (*See id.* 26:8–27:23, 40:21–41:12, 66:12–22.) Thus, Sutton testified that Friedman's "general attitude in the office and the company" had been a source of concern, (*Id.* 27:3), and specifically that Friedman "at times has a bad temper, and at times [Friedman] can be condescending to other people.... I like a peaceful office, and I like people enjoying coming to work. The screaming, the tantrums, in my opinion, is not the way to get through to people," (*Id.* 27:12–13, 27:20–23). Nonetheless, Friedman was not a target for termination at that point—

"[w]hen you're having conversations about how to reduce your overhead, you know, many names of many employees [ ] come up in those conversations." (*Id.* 66:19–22.)

It was against this backdrop, however, that Sutton received a telephone call from McConnell on August 2, 2005. Central to the ensuing conversation (the "August 2 conversation") was an incident that occurred earlier at a Coldwater Creek vendor conference in West Virginia, which Friedman attended. (*See* Friedman Dep. 81:16–25.) According to Friedman, he showed an article to two Coldwater Creek employees about how other vendors had litigated the issue of "excessive chargebacks and other penalties" levied on vendors by customers. (*See id.* 89:15–25.) By his description, however, the incident was innocent:

Q: Were you of the opinion at that point in time that the Coldwater Creek vendors should bring a suit over [sic] Coldwater Creek over their markups or chargebacks?

A: Absolutely not. As I said earlier, it was strictly a point of information, nothing more, not a criticism, even though personally I felt that their markup structure was excessive, but I realized that I had to live with it because that is the way that it had to be. I just wanted to show them what else was happening out in the world. Keep in mind what I said before, they work and live on a mountaintop in Idaho. They don't know what's going on in the market place. (*Id.* 96:9–23.) Though he only gave one copy of the article to the two employees, Friedman nevertheless concedes that there were others around—perhaps 30 or 40—who may have seen the exchange. (*See id.* 89:5–9, 91:11–23.)

It was partly this "chargeback incident" that prompted the August 2 conversation. (*See* McConnell Dep. 32:3–8.) According

to McConnell, one of the Coldwater Creek employees involved in the chargeback incident approached McConnell to relate how "[s]he was very upset, and she couldn't believe that [Friedman] did that, and that he did that in the forum that he did it in. And, again, very unprofessional and embarrassing." (*Id.* 28:7–10.) Thus, McConnell contacted Sutton to let him "know what [Friedman] had done at this meeting, because I felt it did not represent Sutton well." (*Id.* 32:4–6.)

The chargeback incident, however, was not the only issue that Coldwater Creek had with Friedman. The nature of the relationship between Coldwater Creek and Sutton Creations appears to have required seemingly constant communication between Friedman and various employees at Coldwater Creek. (*See* Friedman Dep. 32:19–35:18.) McConnell testified that "ongoing issues" developed between Friedman and her entire staff during the course of their communications. (McConnell Dep. 31:22–23, 43:14–20, 58:9–17.) Sutton's testimony is not inconsistent:

> They had a number of issues with [Friedman] over the prior few years. I can't give you specifics. I know that they were very unhappy with the way that he spoke to many of the employees at Coldwater Creek.
>
> . . .
>
> Did they give me specific incidents? I don't know. But, I do know that they felt that he spoke very horribly or in a

condescending way to several of their employees.

(Sutton Dep. 35:7–11, 36:15–18.) McConnell testified to one such incident, where Coldwater Creek employee Sue Thompson "came into [McConnell's] office crying and shaking, for she had gotten off the phone with [Friedman], and she was very visibly upset about the way he talked to her, about how he made her feel stupid, how he talked to down [sic] to her, how unprofessional he was." (McConnell Dep. 46:21–47:2.) While not denying the incident, Friedman does not recall it as dramatically: "I apparently had said something to Sue which had disturbed her or bothered her. . . . I told [McConnell] I was surprised because . . . I did not hear anything in response to our conversation and I would certainly call her when I got back to the office." (Friedman Dep. 87:14–21.)

Regardless of the specifics concerning that particular incident, all the parties agree that McConnell called Sutton on August 2, 2005, to complain about Friedman's conduct as the Sutton Creations sales representative assigned to Coldwater Creek.[1] Both Sutton and McConnell testified that McConnell told Sutton that she wanted Friedman removed from the Coldwater Creek account but that she did not request that Friedman's employment with Sutton be terminated. (*See, e.g.,* Sutton Dep. 35:5–17, 65:18–22; McConnell Dep. 35:23–

---

1. Friedman was not present during the August 2 conversation. Instead, his factual characterizations of that conversation are based on a second conversation (the "Sutton/Friedman conversation") between he and Sutton two days later. (*See* Friedman Dep. 103:17–104:15.) In the Sutton/Friedman conversation, Friedman claims that Sutton recounted the August 2 conversation verbatim, (*see id.* 104:19–21), and that Friedman subsequently reduced the Sutton/Friedman conversation to notes as was his practice. (*See*

Friedman Aff. ¶¶ 16–17; *see also id.* Ex. A (Notes of Sutton/Friedman Conversation).) Defendants interpose a hearsay objection to Friedman's evidence about the August 2 conversation derived from the Sutton/Friedman conversation, (*see* Defs' Reply 5–8), which Friedman argues is answered by the business records exception (*see* Pl's Opp. 10–11). Because I conclude that summary judgment is appropriate notwithstanding Friedman's evidence, I decline to address the hearsay issue.

36:2).[2]

McConnell acknowledged that she told Sutton during the August 2 conversation that she had previously warned Friedman about his allegedly inappropriate conduct. She testified:

Q: At the August 2, 2005 phone conversation with Mr. Sutton, did you tell him in words or substance that Mr. Friedman had received prior warnings about alleged inappropriate behavior?

A: I don't remember the entire phone call, but we had discussions about that.

Q: You had discussion with Mr. Sutton about that?

A: Yes.

(McConnell Dep. 28:12–20.) Although Sutton was not able to recall McConnell's making that statement during the August 2, 2005 conversation, (see Sutton Dep. 37:15–20), McConnell's acknowledgment is sufficient to establish that fact for summary judgment purposes.[3]

In his affidavit, Friedman asserts that he was never warned about his conduct. (See Friedman Aff. ¶ 13.) Though McConnell admits that no written complaints were conveyed to Sutton, (see McConnell Dep. 41:3–9), she testified to at least one instance where she discussed Coldwater Creek's objections to Friedman's conduct with Sutton and Friedman (see id. 39:2–24). Friedman recalls a conversation with McConnell concerning the incident with Sue Thompson but describes that conversation as pleasant, (see Friedman Dep. 86:8–88:18), that is, apparently not constituting a warning.

As a result of Coldwater Creek's complaints, Sutton Creations terminated Friedman's employment on or about August 5, 2005, and, invoking federal diversity jurisdiction, Friedman thereafter filed this action. His complaint originally included claims for tortious interference with contractual relationship and injurious falsehood in connection with his termination from Sutton Creations; he has abandoned those claims[4] and now only presses a claim for tortious interference with prospective economic advantage (hereafter "tortious interference"). As noted above, Defendants moved for summary judgment.

## DISCUSSION

I. Legal Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Mere allegations or denials from the plead-

2. Without citing to the material upon which he relies, Friedman disagrees that "during the August 2, 2005 conversation, Kathy McConnell never asked Abe Sutton to terminate Joel Friedman's employment." (See Pl's 56.1 Stmt. ¶ 28.) Such an unsupported denial is insufficient to raise an issue of fact.

3. Inexplicably, Defendants assert that "Kathy McConnell does not recall stating to Mr. Sutton that she had 'previously warned' Joel Friedman or that this incident was the 'last straw' during the August 2, 2005 conversation." McConnell's testimony makes it clear that she told Sutton that Friedman had received prior warnings about inappropriate behavior.

4. At no time, either on his papers or during argument, did Plaintiff oppose summary judgment with respect to his claims for tortious interference with contractual relationship or injurious falsehood, and it appears that he may have stipulated to their dismissal. (See Defs' Mot. Summ. J. Ex. B.) In any event, summary judgment on those claims is GRANTED on default. See Loc. R. 7.1.

ings will not be sufficient to defeat summary judgment; instead, the party opponent "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether such an issue of fact exists, "a court must examine the evidence in the light most favorable to the non-movant." *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 253 (2d Cir. 2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). So construed, a factual "dispute" is not genuine if no rational fact-finder "could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994).

## II. Tortious Interference with Prospective Economic Advantage

■ As noted above, Plaintiff alleges tortious interference with prospective economic advantage. In order to sustain such a claim, a plaintiff must show that (1) it had a business relationship with a third party, (2) the defendant knew of and intentionally interfered with that relationship, (3) the defendant's interference amounts to "wrongful means," and (4) the defendant's interference caused injury to the relationship. *See, e.g., Kirch v. Liberty Media Corp.,* 449 F.3d 388, 400 (2d Cir.2006). It

is uncontested that Plaintiff had a business relationship with Sutton Creations, that Defendants knew of[5] and intentionally interfered with that relationship, and that such interference caused injury to Plaintiff. The parties disagree about whether Defendants' conduct amounts to the "wrongful means" necessary to support a claim for tortious interference.

The New York Court of Appeals recently provided guidance on that question. *See Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004). In the language of earlier Court of Appeals decisions, the *Carvel* Court perceived a requirement that the conduct at issue somehow exhibit culpability. *See id.* at 189–90, 785 N.Y.S.2d 359, 818 N.E.2d at 1103 (discussing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996)). Thus, concluded the Court, "as a general rule, a defendant's conduct must amount to a crime or an independent tort" in order to state a claim for tortious interference. *Id.* at 190, 785 N.Y.S.2d 359, 818 N.E.2d at 1103. Notwithstanding that general rule, the Court recognized that other interference not necessarily rising to that level could be so "culpable" as to sustain a claim: for example, interference taken solely out of malice. *See id.* Though the Court explicitly declined to give other examples of conduct that would be sufficiently culpable, *see id.* at 191, 785 N.Y.S.2d 359, 818 N.E.2d at 1104, it con-

---

**5.** Defendants argue that they cannot be liable unless they had knowledge of the specific details of Plaintiff's relationship with Sutton Creations; namely, whether he was an owner, employee, or independent contractor of Sutton Creations. (*See* Defs' Mem. 10.) Absent such knowledge, they argue their liability cannot follow. The cases cited by Defendants, however, do not establish any such a heightened knowledge requirement. *See Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,* 03 Civ. 3120, 2005 WL 1902780, at *19 (S.D.N.Y.

Aug.9, 2005) (dismissing tortious interference claim where complaint alleged only Defendants' interference with potential, unnamed future clients); *Bishop v. Porter,* 02 Civ. 9542, 2003 WL 21032011, at *12 (S.D.N.Y. May 8, 2003) (Gorenstein, MJ) (denying opportunity to amend pleadings where likelihood of success on tortious interference claim was slight). It is sufficient for these purposes that Defendants knew there was some business relationship between Plaintiff and Sutton Creations. *See Kirch,* 449 F.3d at 400.

ceded the possibility that some economic pressure might be so "extreme and unfair" as to satisfy that standard, *id.* at 193, 785 N.Y.S.2d 359, 818 N.E.2d at 1105, and courts have since (at least reservedly) included that possibility in their analyses of whether conduct constitutes "wrongful means" sufficient to support a tortious interference claim, *see, e.g., Hassan v. Deutsche Bank A.G.,* 515 F.Supp.2d 426, 431 (S.D.N.Y.2007); *Vinas v. Chubb Corp.,* 499 F.Supp.2d 427, 435 n. 16 (S.D.N.Y. 2007).

■ Thus, for Defendants' interference to constitute the kind of "wrongful means" that will support Plaintiff's claim for tortious interference, one of the following must be true: (1) that conduct must amount to an independent crime or tort; (2) that conduct must have been taken solely out of malice; or (3) that conduct must amount to "extreme and unfair" economic pressure. *See id.* at 189, 785 N.Y.S.2d 359, 818 N.E.2d at 1102–1103.

A.   Independent Crime or Tort

■ Plaintiff's first argues that McConnell made "materially false statements to Abe Sutton on August 2, 2005 to the effect that she had given Plaintiff prior warnings about his alleged inappropriate behavior." (Pl's Opp. 9.) Plaintiff relies principally on one decision for the proposition that misrepresentations *qua* knowingly false statements of fact are *always* sufficient to constitute "wrongful means." *See Miteva v. Third Point Management Co., L.L.C.,* 323 F.Supp.2d 573 (S.D.N.Y.2004). He also argues that there is a genuine factual dispute as to whether McConnell actually made those misstatements, which dispute defeats summary judgment here.[6]

Plaintiff's argument fails regardless of any factual dispute because it misunderstands the legal standard for "wrongful means." Pleading the presence of false statements alone is not enough to support a claim for tortious interference after *Carvel.* As noted above, the false statements must constitute an independent crime or tort, be made solely out of malice, or amount to "extreme and unfair" economic pressure.

Plaintiff's confusion on this point arises from language in the Restatement of Torts, which courts before *Carvel,* including the New York Court of Appeals itself, *see Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445, 449 (1980), relied on for a definition of the kind of conduct that would constitute "wrongful means:"

> [P]hysical violence, fraudulent misrepresentation and threats of illegal conduct are ordinarily wrongful means and subject their user to liability even though he is free to accomplish the same result by more suitable means.

*Restatement (Second) of Torts* § 767, cmt. (c). This and other language led some courts, including the *Miteva* Court to which Plaintiff cites, to conclude that misrepresentations themselves were sufficient to constitute wrongful means, regardless of whether they constituted an independent tort or crime. *See Miteva,* 323 F.Supp.2d at 585. That conclusion, however, has been superceded by the approach laid out in *Carvel.*

Under that approach, at least one court has since held that misrepresentations alone do not amount to "wrongful means."

---

**6.**   As noted above, McConnell testified that she told Sutton that Friedman had been warned before, and, although Friedman acknowledges the conversation, he does not charac-

terize it was a warning. Thus, for purposes of summary judgment, a dispute exists as to prior warnings.

See *Berwick v. New World Network Intern., Ltd.,* 06 Civ. 2641, 2007 WL 949767, at *14 (S.D.N.Y. March 28, 2007) (Koeltl, J.). In that case, plaintiffs held a license to conduct certain fiber optics business in Jamaica, and sought to acquire another fiber optics company. *See id.* at *1. Their tortious interference claim arose from misrepresentations by defendant third company to the effect that it held an exclusive license to conduct the fiber optics business for which plaintiffs claimed to have a license. *See id.* Those misrepresentations, argued plaintiff, caused investors to shy away from their prospective purchase. *See id.* Granting a motion to dismiss on the tortious interference claim, the Court observed:

> The only specific act alleged in the Complaint that could support the claim against Columbus was it [sic] publication of allegedly false statements regarding the exclusivity of its Jamaican fiber optics license. (*See Compl.* ¶¶ 95, 97.) The Court has already found that this conduct could not have constituted defamation, and it similarly does not constitute the kind of "wrongful means" that can form the basis for a tortious interference claim against a competitor. *See Treppel v. Biovail Corp.,* 03 Civ. 3002, 2005 WL 427538, at *8 (S.D.N.Y. Feb.22, 2005) (dismissing tortious interference claim where no statements by the defendants "could sustain a claim for defamation or any other tort") [.]

*Berwick,* 2007 WL 949767 at *14. I follow the *Berwick* Court in concluding that misrepresentations do not constitute "wrongful means" *per se* under *Carvel.* Because Plaintiff does not argue that the statements in this case amount to an independent tort—indeed, Plaintiff has abandoned his injurious falsehood claim—McConnell's misstatements can only support his claim for tortious interference if they were taken

solely out of malice or amount to "extreme and unfair" economic pressure.

B. Solely out of Malice

█ Plaintiff argues that Defendants acted solely out of malice when McConnell called Sutton on August 2, 2005 to request a new account representative. (*See* Pl's Opp. 12–13.) For their part, Defendants offer a legitimate motivation for that request, *viz.,* bringing to Sutton's attention Friedman's pattern of conduct that McConnell's subordinates found "inappropriate and unprofessional," (*see* McConnell Dep. 26:25), "offensive" (*see id.* at 30:4), and which "upset" Coldwater Creek employees, (*see id.* at 25:25, 28:7; *see also id.* at 39:13–19 ("The team of buyers and assistants often complained about how abusive Joel was, how he wouldn't listen, how we often had to remind Joel that we were the customer. It was just very upsetting. And, I wanted to have that meeting to improve communication."); *accord* Defs' Mem. 12). That offering alone would be enough to defeat the "solely out of malice" argument because, at the risk of belaboring the obvious, it shows that McConnell did not act "solely to harm" Plaintiff but instead in the interests of Coldwater Creek and its employees. *See Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 345 F.Supp.2d 360, 364 (S.D.N.Y.2004), *vacated on other grounds sub nom. Catskill Litigation Trust v. Park Place Entm't Corp.,* 169 Fed.Appx. 658 (2d Cir.2006).

To defeat summary judgment, therefore, Plaintiff must present evidence sufficient to create a triable issue of fact as to the legitimacy of McConnell's stated motive. To that end, Plaintiff argues that his conduct could not have been McConnell's motivation because she exhibited "demonstrable willful blindness" to it earlier—that is, McConnell failed to take appropriate action when she learned about Friedman's conduct. (Pl's Opp. 12–13.) This argu-

ment fails primarily because the portions of McConnell's deposition on which Plaintiff relies do not reveal any "demonstrable willful blindness" on McConnell's part. (*See* McConnell Dep. 25:21–29:2, 36:18–37:24.) What they show, as Plaintiff concedes elsewhere, is that McConnell failed to acquaint herself with the circumstances of Friedman's inappropriate conduct as fully as he would have liked. Thus, as Plaintiff points out, McConnell did not talk to other Coldwater Creek employees about the conduct after it was described to her and did not discuss that conduct with Plaintiff himself, (*See* Pl's Opp. 13.) Regardless of *how* McConnell reacted to Plaintiff's conduct, there is no evidence from which a fact finder could doubt the fact that she indeed *reacted to it unfavorably.* In that sense, Plaintiff's own argument reinforces the contention that it was *his* conduct that motivated McConnell's request for a new account representative, not the malice argued by Plaintiff.

## C. Extreme and Unfair Economic Pressure

■ Plaintiff's final argument is that, by threatening to pull the Coldwater Creek account from Sutton Creations unless Plaintiff was removed from that account, Defendants exerted undue economic pressure. (*See* Pl's Opp. 6.) As noted above, the New York Court of Appeals recognized that "extreme and unfair" economic pressure may constitute wrongful means without rising to the level of an independent tort. *See Carvel,* 3 N.Y.3d at 192–93, 785 N.Y.S.2d 359, 818 N.E.2d 1100. The case law does not reveal any precise definition of "extreme and unfair" economic pressure but does require one to conclude that the conduct at issue here falls short of that standard. *Compare Catskill Dev.,* 345 F.Supp.2d at 362–64 (distributing products to Carvel franchisees' competitors not extreme or unfair pressure), *and Masefield*

*AG v. Colonial Oil Indus.,* 05 Civ. 2231, 2006 WL 346178, *9, 2006 U.S. Dist. LEXIS 5792, *27–29 (S.D.N.Y. Feb. 15, 2006) (urging third party to raise prices or cancel contract not extreme or unfair economic pressure), *and New Stadium LLC v. Greenpoint–Goldman Corp.,* 44 A.D.3d 449, 843 N.Y.S.2d 290 (1st Dep't 2007) (defendant's withholding consent to lease assignment in order to extort $9 million consent fee from plaintiff might constitute extreme and unfair economic pressure), *and Lawrence v. Union of Orthodox Jewish Congregations of Am.,* 32 A.D.3d 304, 820 N.Y.S.2d 60 (1st Dep't 2006) (sending letter to employer's customers urging boycott of employer unless employer fired plaintiff not extreme and unfair economic pressure). In this case, Coldwater Creek threatened to take its business elsewhere unless it was given an account representative who was, in its estimation, courteous and professional. There may be a day when requiring such basic business behavior exposes one to civil liability, but that day must await the New York Court of Appeals' overturning of *Carvel,* for the action complained of here cannot constitute the kind of "extreme and unfair" economic pressure envisioned by the *Carvel* Court.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [dkt. 9] is GRANTED. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.